## JOSEPH F. TRIONFO & SONS, INC. *v.*
## BOARD OF EDUCATION OF
## HARFORD COUNTY

[No. 358, September Term, 1978.]

*Decided January 10, 1979.*

The cause was argued before MORTON, THOMPSON and LISS, JJ.

*S. Leonard Rottman,* with whom were *Tabor & Rottman* on the brief, for appellant.

*William O. Carr* for appellee.

THOMPSON, J., delivered the opinion of the Court.

This is an appeal from an order of the Circuit Court for Harford County (Higinbothom, J.) granting a motion for summary judgment. Joseph F. Trionfo & Sons, Inc., appellant, urges us to reverse the decision below on the grounds that there are genuine disputes of material facts, the resolution of which demand a trial, and that appellee, Board of Education of Harford County, was not entitled to a judgment as a matter of law.

In December of 1973, appellee invited bids for the construction of the North Harford Middle School. Various drawings, specifications and other documents relating to the project were made available to interested contractors for the purpose of computing their bids. Appellant, a general contractor, submitted the low bid of $6,695,200.00 and was awarded the contract. During the course of site clearing and excavation, appellant's subcontractor encountered a substantial quantity of rocks in the subsurface. The subcontractor claimed, and recovered from appellant, extra compensation for the unanticipated difficulty in excavating this material from the site. Appellant then brought this action against appellee claiming compensation for the additional expenses allegedly due to inaccurate and misleading representations made by appellee concerning the nature of the subsurface conditions on the site.

The contract specifications contained the following provisions relative to excavation work and subsurface conditions:

> "*BASIS OF CONTRACT*
>
> Excavation work under this contract is unclassified, and includes (without limitation thereto) excavation and removal of all soil, shale, rock, boulders, existing foundations, fill, and every kind of subsurface condition encountered in contract area.
>
> No extra or additional compensation for excavation will be paid under this contract for work included in Bid Proposal at time of bidding.
>
> *Subsurface Soil Data*: Data concerning subsurface

materials or conditions which is based upon soundings, test pits, or test borings, has been obtained by Architect for his own use in designing project. Its accuracy or completeness is not guaranteed by Owner or Architect and in no event is it to be considered as part of contract plans or specifications. Contractor must assume all responsibility in excavating for this project and shall not rely on subsurface information obtained from Architect, or indirectly from Owner. Bidders shall make their own investigation of existing subsurface conditions; neither Owner or Architect will be responsible in any way for additional compensation for excavation work performed under the Contract due to Contractor's assumptions based on sub-soil data prepared solely for Architect's use."

Test boring data was not provided with or among the specifications or other contract documents, but appellee did make the data available for review by bidding contractors upon written request. Such requests were required to be in the following form:

"Please forward copies of test boring data sheets for the subject project. The contracting firm herein named releases the Owner and Architect from any responsibility or obligation as to its accuracy or completeness or for any additional compensation for work performed under the contract due to assumptions based on use of such furnished information."

Appellant obtained the test boring data by making a request in the required form.

Appellant's essential contention is that it was entitled to rely on the subsurface soil data furnished by appellee, despite the specific release which appellant executed as a prerequisite to obtaining the information and despite the contract provisions excluding such information from the specifications and disclaiming any guarantee of its accuracy. Finding no Maryland authority specifically controlling this situation,

appellant turns to cases in other jurisdictions which it contends represent a majority view that general exculpatory clauses disclaiming responsibility for the accuracy of subsurface soil data are of no effect when the positive representations made by the landowner are obviously intended to be used by bidding contractors for formulating their bids. A careful review of the cases cited by appellant reveals that the factual situations involved were different from that presented here, and that the principles there relied upon are not applicable to the instant case.

Appellant first cites *Hollerbach v. United States,* 233 U. S. 165, 34 S. Ct.. 553, 58 L. Ed. 898 (1914), as the leading case on this subject. The factual situation in *Hollerbach,* however, is easily distinguishable from that present here. The case arose out of a contract for the repair of a dam. The specifications made a positive representation as to the nature of the material behind the dam. In another portion of the contract the following exculpatory clause was found.

> "20. It is understood and agreed that the quantities given are approximate only, and that no claim shall be made against the United States on account of any excess or deficiency, absolute or relative, in the same. Bidders, or their authorized agents, are expected to examine the maps and drawings in this office, which are open to their inspection, to visit the locality of the work, and to make their own estimates of the facilities and difficulties attending the execution of the proposed contract, including local conditions, uncertainty or weather, and all other contingencies." 233 U. S. at 167.

The Court refused to hold that this general exculpatory language was sufficient to overcome the specific and unequivocal representation concerning the material behind the dam.

> "We think it would be going quite too far to interpret the general language of the other paragraphs as requiring independent investigation of facts which

> the specifications furnished by the Government as a basis of the contract left in no doubt. *If the Government wished to leave the matter open to the independent investigation of the claimants it might easily have omitted the specification as to the character of the filling back of the dam.* In its positive assertion of the nature of this much of the work it made a representation upon which the claimants had a right to rely without an investigation to prove its falsity." 233 U. S. at 172. (Emphasis added.)

In the instant case the exculpatory and disclaimer clauses are specifically directed at the subsurface soil conditions. In addition, the nature of the release required to be executed before obtaining the test boring data in this case makes it clear that appellees did not expect the bidding contractors to rely on any of the information contained therein. Under these circumstances we do not find *Hollerbach* applicable.

Appellant next cites *Robert E. McKee, Inc. v. City of Atlanta,* 414 F. Supp. 957 (N.D. Ga. 1976). The Court in that case recognized that the owner does not become an insurer merely by providing certain information to bidders. There, the results of test borings were gratuitously provided to bidders along with the specifications and other contract documents. The contract provided that the owner would not be responsible for the accuracy of the test results or for any conclusions drawn from them. It further provided that the test boring data was not to be considered a part of the contract. The court held that the contractor could recover for misrepresentation if two criteria were met. First, the bidder must not have been reasonably able to discover the true facts for himself. The Court pointed out in this regard that the appropriateness of a site inspection by the bidder depends on the facts of each case and the central question in each case is whether the bidder placed justified reliance on data provided by the owner. Even if we were to apply this criterion in the present case its application would be of no avail to appellant. It is quite clear from the contract documents and the release executed by appellant that the bidders were not

justified in relying on the test boring data. Appellant contends in its brief that because the time span between the date when bidders could first obtain drawings, specifications and other documents until the bid opening date was only three weeks, they were precluded from obtaining independent test boring data. There is no indication in appellant's affidavit in opposition to the motion for summary judgment that this was true. Neither the affidavit nor anything else in the record indicates that independent test boring data could not have been obtained within that period.

Assuming that three weeks was an insufficient time within which to make the necessary tests, the contract documents clearly prohibited reliance on any of the subsurface soil information obtained by the appellee for its own use. Here, unlike *McKee, supra,* no such information was gratuitously supplied to contract bidders but, on the contrary, it was made available to them only upon the execution of an express written agreement by the contractor to release the appellee from any responsibility for the accuracy or completeness of the information. To hold that appellant might have been justified in relying on the test boring data simply because it had insufficient time within which to conduct its own tests would require us to ignore not only all the language in the contract documents disallowing any such reliance but also the clear import of the release executed by the appellant. Instead of ignoring the contract documents and the terms of the release, appellant, if it wished to submit a bid without conducting its own tests, could have adjusted its bid to cover the risk which any reasonable bidder would have known it was encountering.

In *Al Johnson Construction Co. v. Missouri Pacific Railroad Co.,* 426 F. Supp. 639 (E.D. Ark. 1976), also relied upon by appellant, there was proof sufficient to convince the trial judge that the owner did not really expect bidders to make their own subsurface tests and did expect them to rely on its test data. The contract in that case involved a "changed conditions" clause providing for an equitable adjustment in compensation where actual conditions were discovered to be different from those depicted in the specifications. The Court

stated that "the presence of the changed conditions clause works to reassure bidders that they may confidently rely on the [test boring] logs and need not include a contingency element in their bids." 426 F. Supp. at 647. The contingency element referred to by the Court was an element of costs, likely to be included in bids, generally representing the expense of independent test borings or the risk of embarking on a project without being able to rely on the owner's subsurface data.

Appellant also relies on *Condon-Cunningham, Inc. v. Day,* 22 Ohio Misc. 71, 258 N.E.2d 264 (Cuyahoga County Ct. C.P. 1969). There, elaborate soil and subsurface investigation reports were made available to contract bidders as a source of supplementary information and not as part of the contract documents. The Court held that the contractor had a right to rely on this information regardless of whether it constituted part of the contract documents. It should be noted that case involved no disclaimers, exculpatory clauses or releases from liability such as exist in the present case. The Court in *Condon,* as have other courts, discussed the economic efficiency of permitting contractors to rely on test boring data furnished by the owner. It is said to be less expensive for the owner to supply one set of such data rather than for each contractor to go to the expense of making independent tests not knowing whether it would be awarded the contract. It has been pointed out that requiring each and every contractor to incur such an expense or to assume the risk of meeting unexpected subsurface conditions, would unnecessarily increase the bids in general and, in the end, create greater expenses for the owner. Economic efficiency, however, does not justify disregarding the clear terms of a contract, such as that involved here, which has been entered into freely and understandingly by competent parties. *See, e.g., Automatic Retailers of America, Inc. v. Evans Cigarette Service Co.,* 269 Md. 101, 304 A. 2d 581 (1973); *Compania De Astral, S.A. v. Boston Metals Co.,* 205 Md. 237, 107 A. 2d 357 (1954); *cert. denied,* 348 U. S. 943, 75 S. Ct. 365, 99 L. Ed. 738 (1955); *Great United Realty Co., Inc. v. Lewis,* 203 Md. 442, 101 A. 2d 881 (1954).

The remaining cases cited by appellant are likewise distinguishable on their facts. *See Fattore Co., Inc. v. Metropolitan Sewerage Commission of the County of Milwaukee,* 505 F. 2d 1 (7th Cir. 1974) (Broad exculpatory clause not permitted to render changed condition clause meaningless.); *Woodcrest Construction Co., Inc. v. United States,* 408 F. 2d 406 (Court of Claims 1969), *cert. denied,* 398 U. S. 958, 90 S. Ct. 2164 (1970) (Government core boring logs in bidding documents failed to indicate ground water shown by borings.); *Robert E. Lee & Co., Inc. v. Commission of Public Works of the City of Greenville,* 248 S. C. 84, 149 S.E.2d 55 (1966) (Exculpatory clause did not exonerate owner who showed subsurface conditions on plans but excluded unfavorable conditions revealed by test borings.); *Metropolitan Sewerage Commission v. R. W. Construction, Inc.,* 72 Wis. 2d 365, 241 N.W.2d 371 (1976) (Where plans for sewer construction purported to show subsurface condition but did not indicate unfavorable conditions revealed by test borings, court refused to abrogate changed conditions clause on basis of exculpatory provision.).

As has been mentioned above, many of the cases relied on by appellant involve contracts which contain "changed conditions" clauses. Such clauses have been recognized as useful devices for avoiding both unnecessary losses and windfall profits. By assuring that a contractor will be compensated for unanticipated conditions, such clauses make it unnecessary for the contractor to inflate his bid to cover the risk of encountering unforeseen difficulties. Owners benefit by being spared the unnecessary expense of meeting this risk factor. Because changed conditions clauses have this laudatory effect courts have been understandably reluctant to abrogate them by giving effect to exculpatory clauses. While such devices make economic sense, there is no requirement that public contracts employ them. The parties here embarked upon this project without the benefit of such a provision. The specifications clearly provided that "no extra or additional compensation for excavation will be paid under this contract for work included in bid proposal at time of bidding."

Aside from the absence of a changed conditions clause, this case has one other crucial aspect which distinguishes it from those cited by appellant as well as from all other such cases which our research has revealed. Here the alleged misinformation, upon which appellant claims to have relied, was made available to appellant only upon the execution of an express written release. In exchange for the privilege of obtaining the subsurface soil data, compiled by appellee for its own use, appellant expressly released appellee from any responsibility for the accuracy of the information and from any liability for work which was unanticipated due to assumptions based on that information. There is no indication that the release is illegal or contrary to any public policy. Nor is there any suggestion that it is the product of fraud, mistake, undue influence, overreaching or the like. It represents an understanding between the parties which we cannot ignore and which is entitled to be enforced according to its terms. *See Winterstein v. Wilcom,* 16 Md. App. 130, 134, 293 A. 2d 821, *cert. denied,* 266 Md. 744 (1972).

We do not hold that an exculpatory clause disclaiming any responsibility for the accuracy of information provided by an owner to a contract bidder will always relieve such an owner from the consequences of a misrepresentation. As in any case based on a theory of misrepresentation, in order to recover appellant must establish a right to rely on the information furnished by the owner. We hold as a matter of law that under the circumstances of this case no such reliance was warranted. This conclusion is based on the following undisputed facts:

a) The excavation work under the contract was unclassified and included the excavation, without limitation, of every kind of subsurface material encountered in the contract area;

b) There was no representation in the contract documents as to subsoil conditions;

c) The test boring data obtained by the architect and owner for their own use was specifically excluded from the contract documents;

d) The test boring data could be obtained by contract bidders only in exchange for a release of the owner from any responsibility or obligation as to its accuracy or completeness or for any additional compensation for work performed under the contract due to assumptions based on the use of such data;

e) The contract documents specified that the contractor would assume all responsibility for the excavation of the project;

f) The specifications further provided that the contractor was not to rely on subsurface information obtained from the architect or the owner and that neither the owner nor the architect would be responsible in any way for additional compensation for excavation work performed under the contract due to the contractor's assumptions based on subsoil data.

In addition, there is no allegation or indication in the record that this contract was not entered into freely, voluntarily, and understandingly by both parties. To hold under these circumstances that appellant is entitled to recover would be to hold that the owner furnishing test results merely as an accommodation to bidders is an insurer of their accuracy and would require us to ignore the explicit language in the contract documents and in the release executed by appellant as a prerequisite to obtaining the test boring data. As pointed out by the Supreme Court of California in *Wunderlich v. State,* 65 Cal. 2d 777, 56 Cal. Rptr. 473, 423 P. 2d 545 (1967), such a result is not called for even under cases such as *Hollerbach, supra* and those which have followed it. Such cases "do not stand for the proposition that the government may never effectively disclaim the intention to warrant conditions." 423 P. 2d at 550.

Our conclusion that appellant had no right to rely on the test boring data renders its contention that there is an actual dispute as to the accuracy of that data immaterial. Nevertheless, we note that appellant's allegation in its affidavit that the test boring data sheets were inaccurate and

misleading is insufficient to raise a genuine dispute on that issue. General allegations which do not show facts in detail and with precision are insufficient to prevent the entry of a summary judgment. *Hurt v. Stillman & Dolan, Inc.,* 35 Md. App. 644, 371 A. 2d 1137 (1977). The pertinent allegation in the affidavit is as follows:

> "11. Based on the test boring data sheets provided by the Defendant, Plaintiff had not anticipated encountering substantial amounts of rock in the subsurface at the site, and the fact that substantial amounts of rocks were encountered was a surprise to the Plaintiff. Because the test boring data sheets were inaccurate and misleading *in failing to disclose the substantial amount of rocks in the subsurface at the site,* Plaintiff materially underestimated the cost of construction for the Project and suffered damage and loss on account thereof." (Emphasis added.)

There is no allegation here that the results of the tests themselves were misrepresented or that the test did not accurately reflect the soil conditions at the points where they were taken. In the absence of such specific allegations, appellant's statement that "the test boring data sheets were inaccurate and misleading in failing to disclose the substantial amount of rocks in the subsurface at the site" is merely an unsupported conclusion.

Appellant finally contends that the motion for summary judgment should have been denied because of appellee's failure to submit a statement of points and citation of main authorities with the motion as required by Md. Rule 319. There is no indication in the record that this procedural matter was raised below and therefore it has not been preserved for appellate review. Md. Rule 1085.

*Judgment affirmed.*
*Appellant to pay the costs.*