[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 498 
 I. FACTS
This is an appeal from a summary judgment entered by the circuit court in favor of defendant Providence Hospital ("Providence") as to the four causes of action asserted against it by plaintiff Berkel and Company Contractors, Inc. ("Berkel"). Berkel sued Providence and its architect[1] for claims arising out of the construction of an addition to Providence Hospital in Mobile. Berkel contracted with Greenhut Construction Company, Inc. ("Greenhut"), the general contractor, to install piles for the foundation of the addition. *Page 499 
A. 1979-1980 Project.
Providence issued its invitation for general contractors to bid on the hospital addition on September 17, 1979. Providence made available to bidders the plans, specifications, and addendum prepared by its architect, and a soil report prepared for Providence by an engineering firm, Vester J. Thompson, Jr., Inc. ("Thompson" or "soils engineer"). Thompson's soils report was based on eight soil test borings, only one of which was taken in the actual excavation site. The evidence is in conflict as to whether the soils report revealed a subsurface stratum which would tend to affect the installation of cast-in-place piles.[2]
Greenhut was the successful bidder and contracted with Providence on January 15, 1980. Greenhut then subcontracted with Berkel to install the piling supports. Berkel's contract with Greenhut incorporates by reference certain documents from Greenhut's contract with Providence, including the general conditions of the contract for construction, the specifications for cast-in-place piles and the bidder's information package. The plans called for installation of 304 predrilled, cast-in-place piles. The piles were 16 inches in diameter, averaging 85 feet in length, with design capacities of 77 or 97 tons per pile. Each pile was supported with a cage of steel reinforcement bars extending 15 feet below the surface.
The pile specifications included many requirements. First, the admixtures used in the pile grout mix had to possess the property of combining with lime liberated during the process of hydration of Portland cement. Second, the mix design of the pile grout had to be approved by the architect. Third, at least two test piles had to be load tested to at least twice design capacity.
Berkel submitted its grout mixture, referred to as Underwood grout, on February 11, 1980, to Greenhut, who then submitted it to the architect for approval. The architect returned the Underwood grout mix submittal on March 7, 1980, with the notation "Furnished as Noted." It is unclear whether the architect's action constituted approval or something else. Berkel began installing test piles.
On May 21, 1980, Berkel installed two test piles. One test pile was 77 feet long and had a design capacity of 77 tons (No. 1); the second was 85 feet long and had a design capacity of 97 tons (No. 2). On June 3, both piles failed a load test of approximately 100 tons.
The parties were at a loss to explain why the test piles failed. Cylinders from both piles were tested for compressive strength and were found to surpass the specification requirements. After additional soil borings, Thompson, the soils engineer, determined that the bearing stratum below the tips was consistent with or better than the criteria used for pile design.
Berkel was instructed by the architect and soils engineer to install an additional test pile. Berkel was specifically instructed by Thompson regarding installation. The additional test pile (No. 3) failed a load test on June 23, 1980. Testing of the grout cylinders for the pile revealed that the aggregate in the grout was finer than specified. The finer sand required a longer time to gain strength.
The architect and soils engineer then requested Berkel to install a pile using Radcliff grout. Radcliff grout differed from Underwood grout in that it did not contain an admixture which combined with lime, as required by the specifications; the sand in the Radcliff grout was, however, of the specified gradation.
The test pile using Radcliff grout (No. 4) was installed on June 26, 1980. No conclusion had been reached as to why the Underwood grout test piles had failed while the Radcliff grout test pile had succeeded. Nevertheless, Berkel received instructions through Greenhut from the architect that it was to proceed with installation of the 97-ton *Page 500 
production piles. Greenhut had been verbally informed by the architect to proceed, with the promise of written confirmation. No written confirmation was received from the architect. Greenhut did receive a copy of the soils engineer's letter recommending that installation proceed. Berkel contends that it was authorized to use Underwood grout, provided sand of the correct gradation was used, as verified in biweekly tests.
At the same time Berkel was directed to proceed with installation of the 97-ton production piles, it also was directed to install another 77-ton test pile. This Underwood grout test pile (No. 5) was tested on July 17, 1980, and failed at less than 100 tons. Tests revealed that the pile had sheared at 17 feet below the surface, just two feet below the reinforcement bar cage. The pile was excavated and swirling patterns of foreign material were observed over approximately a two-foot length immediately below the reinforcement bar cage.
On July 18, 1980, the architect directed Greenhut and Berkel to cease installing production piles. Berkel had, by then, installed 87 of the 97-ton production piles.
Thereafter, additional tests were conducted. Three of the production piles using Underwood grout with sand of the specified gradation failed a load test of 110 tons. The parties excavated the soil from around one of the test piles. At approximately 17 feet below the work surface, a fine layer of sand was observed. Water was also found to be flowing from the sand. The evidence presented is in dispute as to whether this stratum of cohesionless sand appeared in the soils report. Still, no consensus was reached as to the cause of the pile failure.
Berkel continued to install test piles at the direction of the architect. The test piles were all constructed with Radcliff grout, but had varying lengths of reinforcement bar cages and were inserted using different methods. By August 15, 1980, five Radcliff test piles had been successfully load tested, though at less than twice their design capacity. The architect authorized Greenhut and Berkel to install production piles using Radcliff grout. Berkel was given the option of either load testing each of the 87 production piles previously installed or replacing them with piles using Radcliff grout. Berkel proceeded to install production piles using Radcliff grout. Installation of all piles was complete on or about September 24, 1980.
B. The 1968 Project.
Following the failure of test piles Nos. 1 and 2 in June 1980, Greenhut and Berkel learned for the first time that a subcontractor installing piles on an earlier, nearby project at Providence Hospital in 1968 had been unable to successfully load test its piles. The 1968 failure was caused by soil conditions which led to the sinking or pushing of piles into the ground. The tests conducted during the period June 4-9, 1980, indicated that the 1980 failure did not involve piles pushing or sinking into the ground.
C. Berkel's Claim For Additional Compensation.
On October 7, 1980, Berkel submitted its claim for additional compensation to recover what it had expended because of the unaccepted Underwood piles. Greenhut added its claim for additional compensation and presented both claims to Providence and its architect. Both claims were denied and the current action was filed.
Berkel filed a four-count complaint. Count one alleged that Providence and its architect breached their duties of care in directing Berkel's installation of the permanent piles. Count two alleged that Providence's agent, the soils engineer, negligently tested and reported subsurface soil conditions. Count three alleged that Providence misrepresented subsurface soil conditions. Count four maintained that Providence suppressed material facts concerning the 1968 project which it was obligated to communicate. The circuit court granted summary judgment on each count as to Providence. Berkel appeals from this order granting summary judgment. *Page 501 
 II. STANDARD FOR REVIEW
This Court places a heavy burden on a party who moves for summary judgment.
 "A party moving for summary judgment has the burden of clearly showing that . . . there is an absence of a genuine issue as to any material fact. The moving party must be entitled to the . . . judgment as a matter of law. Furthermore, all reasonable inferences from the facts are to be viewed most favorably to the nonmovant."
Butler v. Michigan Mut. Ins. Co., 402 So.2d 949, 951 (Ala. 1981) (citations omitted). See Day v. Merchants Nat'l Bank ofMobile, 431 So.2d 1254, 1256 (Ala. 1983).
By the same token, a summary judgment motion, properly supported as provided for under Rule 56 (e), Alabama Rules of Civil Procedure, must be granted "unless the adverse party makes an evidentiary or factual showing in opposition to show that there is a genuine issue of fact for trial." Butler, 402 So.2d at 951. The non-movant need only establish a scintilla of supporting evidence to avoid summary judgment. White v. White,431 So.2d 1208, 1209 (Ala. 1983).
 III. SUBSTANTIVE CLAIMS ON APPEAL A. Count One — Breach of Duty in Directing the Pile Installation.
Berkel contends in count one that Providence and its agent-architect[3] breached their duty of care in directing Berkel's installation of the permanent piles. Providence first argues that neither it nor its agent owed a duty of care because of the lack of privity with Berkel. Alabama courts have rejected the absence of privity of contract as a defense to a negligence action. In Federal Mogul Corp. v. Universal Constr.Co., 376 So.2d 716 (Ala.Civ.App. 1979), the Court of Civil Appeals held:
 "As a matter of law, plaintiff's theory of recovery against [the defendant subcontractor] was properly cognizable in the trial court. Our cases hold that, where the charge of negligence is based upon breach of duty arising out of a contractual relationship, no cause of action arises in favor of one not in privity to the contract. However, there are exceptions, such as where there is an invasion of a duty independent or concurrent with the contract. Weston v. National Mfrs. Stores Corp., 253 Ala. 503, 45 So.2d 459
(1950).
 "Stated alternatively, defendant's duty may arise from a social relationship as well as from a contractual relationship. Williams v. Jackson Co., Ala.Civ.App., 359 So.2d 798, cert. denied, 359 So.2d 801 (Ala. 1978).
 "Although plaintiff may be barred from recovering from defendant as a third party beneficiary to defendant's contract with another, plaintiff may nevertheless recover in negligence for defendant's breach of duty where defendant negligently performs his contract with knowledge that others are relying on proper performance and the resulting harm is reasonably foreseeable."
See also E.C. Ernst, Inc. v. Manhattan Constr. Co. of Tex.,551 F.2d 1026 (5th Cir. 1977), cert. denied, 434 U.S. 1067,98 S.Ct. 1246, 55 L.Ed.2d 769 (1978) (under *Page 502 
Alabama law, an electrical subcontractor on a construction project may proceed on a negligence theory in an action against an architect absent contractual privity between them); Zeiglerv. Blount Bros. Constr. Co., 364 So.2d 1163 (Ala. 1978) (opinion assumes recovery possible absent privity if damages are foreseeable); Havard v. Palmer Baker Eng'rs, Inc.,293 Ala. 301, 302 So.2d 228 (1974) (tunnel inspector owes duty of care to third-party tunnel travelers); Looker v. Gulf CoastFair, 203 Ala. 42, 81 So. 832 (1919) (owner has duty to third parties to act reasonably upon architect's advice); McGaha v.Steadman, 410 So.2d 420 (Ala.Civ.App. 1981). The rationale behind not requiring privity is explained by Professor Prosser:
 "[B]y entering into a contract with A, the defendant may place himself in such a relation toward B that the law will impose upon him an obligation, sounding in tort and not in contract, to act in such a way that B will not be injured. The incidental fact of the existence of the contract with A does not negative the responsibility of the actor when he enters upon a course of affirmative conduct which may be expected to affect the interests of another person."
W. Prosser, Law of Torts § 93 at 622 (4th ed. 1971).
Providence argues that Berkel cannot enforce Providence's duties under a contract with others absent privity or third-party beneficiary status.[4] Twine v. Liberty Nat'l LifeIns. Co., 294 Ala. 43, 50, 311 So.2d 299, 305 (1975). Providence misconstrues the basis of duties in negligence actions. A plaintiff may argue that another party owes a duty under a contract upon which the plaintiff reasonably relied.McGaha v. Steadman, 410 So.2d 420, 421 (Ala.Civ.App. 1981);Federal Mogul Corp. v. Universal Constr. Co., 376 So.2d 716,724 (Ala.Civ.App. 1979). Alternatively, a plaintiff may argue that another party has duties independent of any contract because that party has acted affirmatively. Dailey v. City ofBirmingham, 378 So.2d 728, 729 (Ala. 1979); Herston v.Whitesell, 374 So.2d 267, 270 (Ala. 1979); McGaha v. Steadman,410 So.2d 420, 421-22 (Ala.Civ.App. 1981). This latter proposition is the basis of count one. Providence can be held liable for negligence injuring third parties, whether or not Providence has a similar duty under contract to some others. The existence of a collateral contract does not negate the obligation imposed in tort to act reasonably. In this case, we need not consider whether an unreasonable omission to perform a contract duty can ever create liability to third parties in a construction setting.[5]
In this case, Berkel does not seek to impose contract duties on Providence or its agents. Instead, Berkel contends that by affirmatively embarking on a course of conduct (whether or not this exercise sprang from a contract setting), Providence assumed a duty to third parties to act reasonably. We recognize that contracts may impose greater or lesser degrees of responsibility and that third parties are generally not entitled to benefit from contract standards which differ from the standard of care generally applicable in negligence actions. See Note, "Architectural Malpractice: A Contract-Based Approach," 92 Harv.L.Rev. 1075, 1087-88 (1979).
Providence argues further that even if privity is not a defense, the facts disclosed that no duty was owed to Berkel. In deciding whether to impose a duty in a construction context, the trial court should analyze six factors: *Page 503 
 "`(1) [T]he extent to which the transaction was intended to affect the other person; (2) the foreseeability of harm to him; (3) the degree of certainty that he suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury; (5) the moral blame attached to such conduct; and (6) the policy of preventing future harm.'"
Howe v. Bishop, 446 So.2d 11 (Ala. 1984) (Torbert, C.J., concurring in the result), quoting from United Leasing Corp. v.Miller, 45 N.C. App. 400, 406-07, 263 S.E.2d 313, 318 (1980). Under this standard, Providence clearly owes Berkel a duty to act reasonably in directing and approving pile construction work. The transaction was intended to affect Berkel, and it was foreseeable that it would. The alleged harm is certain and directly connected to Providence's conduct. Given the business relationship and lack of personal injury, the question of moral blame is not relevant in this case. The final factor, the policy of preventing future harm, also supports the finding of duty. Providence could have averted the alleged loss either by not acting or by acting reasonably. This Court will impose liability on Providence to require it to act responsibly.
This argument for a legal duty is especially compelling because Providence and its architect had the power through liquidated damages and other means to force Berkel to do as Providence wished. The court in United States v. Rogers Rogers, 161 F. Supp. 132, 136 (S.D.Cal. 1958), explained the responsibilities arising from unequal positions in the context of contractor and architect:
 "Altogether too much control over the contractor necessarily rests in the hands of the supervising architect for him not to be placed under a duty imposed by law to perform without negligence his functions as they affect the contractor. The power of the architect to stop the work alone is tantamount to a power of economic life or death over the contractor. It is only just that such authority, exercised in such a relationship, carry commensurate legal responsibility."
Under the circumstances, Providence and its architect owed Berkel a duty to act reasonably in directing the pile work.
Providence finally argues that its actions did not constitute a breach of duty. Providence alleges that it did not order Greenhut and Berkel to proceed with installation of the piles, but merely authorized them to do so. In addition, Providence contends that even if its conduct constituted an implied order, Greenhut and Berkel were contractually required to obtain clarification of Providence's intent. Finally, Providence contends that ordering continuation of the work was reasonable. All three arguments are based upon facts which are in dispute. Berkel has provided affidavits and letters which suggest that Providence and its architects negligently directed continuation of the work. Because summary judgment cannot be granted where there are genuine issues of material fact, we reverse the trial court's summary judgment as to count one.
 B. Count Two — Negligent Testing and Reporting of Subsurface Soil Conditions.
 Count Three — Negligent Misrepresentation of Subsurface Soil Conditions.
Counts two and three relate to the report of the soils engineer. Berkel presented a genuine issue of material fact as to whether the report was prepared negligently and whether the report did not reveal the soil stratum at the 17-foot level which allegedly caused the piles to fail. Providence contends first that it owed no duty of care in supplying the report to bidders. As we held as to count one, a party "who volunteers to act, though under no duty to do so, is . . . charged with the duty of acting with due care." Dailey v. City of Birmingham,378 So.2d 728, 729 (Ala. 1979). Hence, Providence's act of furnishing the report imposes on it the duty of reasonableness.
Providence further contends that in its bid information, it disclaimed any *Page 504 
liability for negligence. The disclaimer provides as follows:
 "12. SOILS INFORMATION. A soils report, prepared by Vester J. Thompson, Jr., Inc., 3707 Cottage Hill Rd., Mobile, Alabama 36609 (205-666-2443), has been prepared for the Owner. Copies of the report dated July 28, 1978 and supplemental reports dated September 4, 1978 and May 21, 1979, concerning Under Floor Drainage System, are on file at that office. No representation or warranty is made by Architect/Engineer, or Owner regarding adequacy or content of this report. Bidders shall obtain, at their expense, information necessary to determine existing site and subsoil conditions to completely perform the Contract as specified in a proper and safe manner."
The provision clearly and unequivocally disclaims responsibility for reliance on the soils report. The disclaimer provides that the soils report was prepared solely for the owner and is not meant to be relied upon by third parties. The provision also includes the necessary step of requiring the bidder to obtain information at its expense to satisfy itself. The thoroughness of the soils report disclaimer satisfies the elements of a legally effective disclaimer. S M Constructors,Inc. v. City of Columbus, 70 Ohio St.2d 69, 72-74,434 N.E.2d 1349, 1352-53 (1982). See Industrial Tile, Inc. v. Stewart,388 So.2d 171, 174-76 (Ala. 1980); Eley v. Brunner-Lay So. Corp.,289 Ala. 120, 123-24, 266 So.2d 276, 279-80 (1972). Hence, Providence has successfully disclaimed liability for the negligence of its agent.
Berkel contends that the disclaimer should be ineffective on policy grounds. Berkel cites Condon-Cunningham, Inc. v. Day,22 Ohio Misc. 71, 258 N.E.2d 264 (1969), for the proposition that the owner will be held liable when the contractor reasonably relies on the furnished information:
 "While the defendant contends that because of the various disclaimers the contractors had no right to rely upon the information given as to the moisture content of the soil, it does seem that it is a strange procedure to furnish the contractors with such information, to invite them to seek more detailed information from the county and to give them extensive boring reports in 11 elaborate pamphlets, which the county invites them to inspect, and then to say because of some of our disclaimers you may not use any of this elaborate information that obviously was obtained by us at much expense and, if you do rely on it, you are doing so at your peril.
". . . .
 ". . . The county, on the other hand, should know what soil they are dealing with in a project they have under consideration. The information, if gathered by the county, will be useful to the county no matter who gets the job. The county should be the logical one to make the tests or have them made and not the bidders who may or may not get the job.
 "If the county has elaborate tests made and makes its finding known to the bidders, the bidders should be able to rely on these tests in all justice and fair play."
(Citations omitted). See also Jacksonville Port Auth. v.Parkhill-Goodloe Co., 362 So.2d 1009 (Fla.Dist.Ct.App. 1978).[6]
Indeed, Berkel presents affidavits attesting to the industry practice of relying on owner-furnished soils information in preparing bids. Moreover, Berkel is quite right in pointing to the economic inefficiency which would result from requiring the contractors to conduct separate soils tests when logically the owner is in the best position to provide the information. To allow the owner to disclaim responsibility may have the economic effect of increasing the cost of bids to reflect the risk shift of a disclaimer, incurring the prospect of repetitious tests, and reducing the number of *Page 505 
bidders. This result will, in the long run, injure parties in the position of Providence.
Despite these economic policy objections, Alabama law firmly embraces the concept of freedom of contract. Contracts between competent parties, voluntarily and fairly made, are valid and enforceable. Vardaman v. Benefit Ass'n of Ry. Employees,263 Ala. 236, 237, 82 So.2d 272 (1955); Lowery v. Zorn, 243 Ala. 285, 9 So.2d 872 (1942). Providence is legally entitled to disclaim liability for a report prepared by its soils engineer, even though to do so may be irrational from a cost perspective. We reject the notion that a disclaimer is ineffective merely because it is, in a larger sense, inefficient. Joseph F.Trionfo Sons, Inc. v. Board of Educ. of Harford County,41 Md. App. 103, 395 A.2d 1207, 1211 (1979). Furthermore, the apparent inefficiency does not offend public policy by creating a permanent condition injurious to society. Therefore, the marketplace, not the judiciary, is the appropriate battleground for such a dispute.
If we were to adopt Berkel's position and declare disclaimers invalid in this context, an owner would be faced with a dilemma. On the one hand, the owner could provide information prepared for it by another, subjecting the owner to liability for negligent preparation. On the other hand, the owner could simply withhold the report. Such an intentional omission might constitute misrepresentation. See Ala. Code § 6-5-102 (1975). Hence, the owner would be faced with potential liability under all circumstances merely by contracting for a soils report for its own use. To prevent the anomalous result of rewarding ignorance, we hold that an owner may disclaim liability for negligent preparation of a report furnished to bidders, so long as an effective disclaimer accompanies it.[7]
Because of the effective disclaimer, Berkel cannot recover for Providence's alleged negligence in preparation of the soils reports or any negligent misrepresentation. We affirm the summary judgment as to counts two and three.
C. Count Four — Suppression of a Material Fact.
Berkel's final cause of action against Providence alleges that Providence suppressed a material fact which it was obligated to communicate. The alleged material fact was that problems had been encountered by the pile subcontractor on the 1968 project. The cause arises under Ala. Code § 6-5-102 (1975):
 "Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case."
Under § 6-5-102, mere silence is not fraud unless confidential relations or special circumstances exist; active concealment or misrepresentation must be present. Collier v. Brown, 285 Ala. 40, 228 So.2d 800 (1969).
Berkel concedes that this is not a case of active concealment and that there is no confidential relationship present. Instead, Berkel contends that the duty to disclose the problems in the 1968 project arose because of the particular circumstances. Application of the "particular circumstances" language necessarily requires a case-by-case application of several factors.
 "A duty to speak depends upon the relation of the parties, the value of the particular fact, the relative knowledge of the parties, and other circumstances. Hall Motor Co. v. Furman, 285 Ala. 499, 234 So.2d 37 (1970). . . . Thus, each case must be individually examined to determine whether a duty of disclosure exists; a rigid approach is impossible, and, indeed, the words of the statute itself counsel flexibility."
Jim Short Ford Sales, Inc. v. Washington, 384 So.2d 83, 86, 87
(Ala. 1980). *Page 506 
Application of these factors in this case leads to inconsistent inferences. The first factor, relationship of the parties, does not support a finding of a duty. In a typical construction bidding arrangement, like the one involved in this case, the owner and the subcontractors are economically self-sufficient entities negotiating at arm's length. The second factor, the value of the particular fact to Berkel, also does not support a finding of a duty. The undisputed evidence shows that the 1968 difficulties were unrelated to those experienced by Berkel. Berkel contends that the 1968 incident "was a material fact which would have affected our bid." Even so, Berkel must show "an actual pecuniary loss as a result of the fraud." Pihakis v. Cottrell, 286 Ala. 579, 586,243 So.2d 685, 692 (1971). See Amason v. First State Bank, 369 So.2d 547
(Ala. 1979).
The final factor, the relative knowledge of the parties, conceivably would argue for a finding of a duty. Providence and its agents knew of previous difficulties in the 1968 project; Berkel did not. Providence argues that the soils report gave Berkel notice of the 1968 project, and further, that Providence required all parties to conduct a full inquiry as to soil conditions. The soils report does show the 1968 addition and the soil borings from the site; however, no reference is made to any problems encountered. Without expert testimony as to the custom of inquiry in the pile construction industry, we cannot say that the soils report put Berkel on notice about the 1968 problems. Hence, a genuine issue remains as to this third factor.
In determining the existence of a duty, the trial court makes a legal decision. See, e.g., Hand v. Butts, 289 Ala. 653,270 So.2d 789 (1972) (duty is a question of law). Even though the third factor is in dispute, we agree with the trial court in this case that Providence did not owe Berkel a duty. Failure to disclose superior knowledge in an arm's length bargain, without injury, does not violate a duty of disclosure or constitute fraud.
This decision is supported, alternatively, by the absence of damages, an essential element of a fraud cause of action.Ringer v. First Nat'l Bank of Stevenson, 291 Ala. 364,281 So.2d 261 (1973). Because Berkel failed to dispute the evidence showing that the 1968 problems were unrelated to the problems in the current case, summary judgment was appropriate as to count four.[8]
 IV. CONCLUSION
We affirm the summary judgment as to counts two, three, and four. We reverse the summary judgment as it relates to count one and remand for a determination consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
FAULKNER, ALMON, EMBRY and ADAMS, JJ., concur.
[1] The architect, Gill, Korff Associate, Architects and Engineer, P.C., is not a party to this appeal. Gill, Korff has answered the complaint, but Berkel's claims against it have yet to be tried.
[2] A cast-in-place pile is produced by drilling a hollow shaft, continuous flight auger into the soil to a predetermined length, then injecting under pressure a cement base grout through the shaft as the auger is slowly withdrawn, filling the cavity.
[3] Until oral argument, Providence did not dispute that the architect was its agent. The contrary assertion is without foundation. Under the traditional owner-architect-general contractor arrangement, Alabama law recognizes "the well established proposition that an architect is the agent for the owner and the owner is responsible for any damages caused by the architect's deficiencies [in supervision and coordination] insofar as the other parties are affected thereby." E.C. Ernst,Inc. v. Manhattan Constr. Co. of Tex., 387 F. Supp. 1001, 1033
(S.D.Ala. 1974) (applying Alabama law) (finding Providence's architect in the 1968 project was its agent), aff'd in part andvacated in part on other grounds, 551 F.2d 1026 (5th Cir. 1977), cert. denied, 434 U.S. 1067, 98 S.Ct. 1246,55 L.Ed.2d 769 (1978). See also Fleming v. Lunsford, 163 Ala. 540, 545,50 So. 921, 923 (1909). A different standard is applicable for determining whether vicarious responsibility can be imposed on an owner for the architect's negligent preparation of plans and specifications. See, e.g., Looker v. Gulf Coast Fair, 203 Ala. 42,81 So. 832 (1919).
[4] Berkel does not claim third-party beneficiary status under the Providence-Greenhut contract.
[5] Compare W. Prosser, Law of Torts § 93 at 623-26 and § 104 at 680-82 (4th ed. 1971), with Caldwell v. Bechtel, Inc.,631 F.2d 989, 1000 (D.C. Cir. 1980) (consulting engineer stands in special relationship with other construction parties and has affirmative duty to warn). Increasingly, courts have found that construction managers, consulting engineers, and architects (under the traditional construction arrangement) bear responsibility to act in situations where they are the only party in a position to prevent a loss. See Sweet, "Site Architects and Construction Workers: Brothers and Keepers or Strangers," 28 Emory L.J. 291 (1979).
[6] We do not consider whether a disclaimer is ineffective when the owner is a public agency. Each of the cases cited by Berkel involves a government entity as owner. Obviously, public policy concerns of efficiency and waste are more readily applicable to situations where the taxpayer bears the loss due to diseconomy.
[7] Disclaimers may not be effective if the defendant is "actively" negligent or acts willfully. See Miami-Dade Water Sewer Auth. v. Inman, Inc., 402 So.2d 1277 (Fla.Dist.Ct.App. 1981).
[8] Berkel's allegation that knowledge of a fact would have materially affected its bid would be an appropriate defense to a contract in an action for rescission. Crooker v. White,162 Ala. 476, 50 So. 227 (1909). Given the absence of contractual relations between Berkel and Providence, Berkel could not sue for rescission, which presumes contract privity.