ADAMS, Justice.
These cases arise out of the failure of an investment venture in Florida. Central Bank of the South (Central Bank) filed a suit against Robert G. Keelean, Dwayne Hawkins, Tom Slaughter, Ernest Winstead, Jerry Coone, and Albert Geiger based on their guaranties of a $4,000,000 note from Holdco of Pinellas County, Inc.[1] Central Bank also filed a separate suit against Hawkins and Keelean with regard to promissory notes signed by them in 1987, subsequent to their guaranties on the $4,000,000 demand note. The 1987 notes were signed by them following the resignation of the chairman of the board of Holdco, who also resigned as president of McNulty Bank, a bank that had been purchased by Holdco. The notes had been signed in order to recol-lateralize the $4,000,000 debt and to prevent Central Bank from selling stock pledged by Holdco as collateral for its $4,000,000 note. These two cases were consolidated, and Keelean and Hawkins then filed counterclaims wherein they alleged that they had been defrauded by Central Bank and Hawkins filed a cross-claim against Keelean for contribution. Keelean, Hawkins, and Slaughter appealed a summary judgment entered for Central Bank with regard to the initial loan of $4,000,000. Hawkins and Keelean appealed a summary judgment entered for Central Bank pertaining to the promissory notes signed by them in 1987. We affirm as to both.
In 1984, Robert Keelean, Dwayne Hawkins, Brad Baldwin, William Baynard, Charles Brooks, Jerry Coone, Albert Geiger, Tom Slaughter, Ernest Winstead, Ha *16 rold Kelley, and Harold Kelley, Jr., formed a holding company known as Holdco of Pinellas County, Inc. Each of the investors maintained a seat on the board of directors of Holdco, which was formed to purchase the outstanding shares of First Bank Holding Company, which owned First Bank of Pinellas County. The board elected Kelley as the president of the new holding company in the event that the purchase could be completed, and appointed him to seek a loan for the new company. The minutes of the organizational meeting of the initial board of directors of Holdco of Pinellas County, Inc., on May 23, 1984, contain the following entry:
“The Chairman then stated it was necessary to approve the Corporation’s obtaining a loan from Central Bank of Alabama or another appropriate lender for the balance of the funds required to close the purchase of the stock of First Bank Holding Company. Upon motion duly made, seconded and unanimously carried, it was:
“RESOLVED, that the President of the Corporation be, and he hereby is, authorized to negotiate with Central Bank of Alabama or another appropriate lender, for a loan to the Corporation in the amount of $4,000,000, said loan to be non-recourse against the individual stockholders of the Corporation and to be on the terms and conditions deemed reasonable to the President;”
When Central Bank agreed to lend the group $4,000,000 for the venture, doubtful loans made by First Bank (later renamed McNulty Bank) caused Central to request a letter of credit from the members of the board. The letter of credit was unacceptable to the board, which, through Kelley, requested that the bank accept guaranties on the loan. The minutes of the board of directors’ meeting on August 2, 1984, stated:
“The Chairman next turned to the loan commitment provided by Central Bank of the South. He stated the loan commitment required a Letter of Credit, but it was his understanding the bank would also take a surety bond. Harold Kelley, Jr. then presented a proposal from New England Financial Management, Inc. to provide the necessary bond. The proposal was reviewed by those in attendance but was not considered satisfactory because of the 3.5% fees for the surety bond. The Chairman requested Mr. Kelley, Jr. to negotiate a reduced fee structure; otherwise the Directors were not interested in proceeding with New England Financial Management, Inc.”
The minutes of the August 13 meeting stated:
“The Chairman next turned to the loan commitment provided by Central Bank of the South. He stated he had met with representatives of Central Bank and had requested they consider (i) eliminating the Letter of Credit requirement, (ii) reducing the amount of the Letter of Credit, or (iii) accepting a surety or fidelity bond in lieu of the Letter of Credit. The Chairman stated he expected a response from Central Bank within the next two weeks.”
The minutes of September 13 stated:
“The Chairman turned next to the loan commitment provided by Central Bank of the South. He reminded those in attendance he had requested Central Bank to consider (1) eliminating the Letter of Credit requirement, (2) reducing the amount of the Letter of Credit, or (3) accepting a fidelity or surety bond in lieu of the Letter of Credit. The Chairman stated he had received a response from Central Bank. He indicated they were willing to waive the Letter of Credit requirement provided the Directors jointly and severally guarantee the $4,000,000.00 loan. The Chairman stated Central Bank wanted the guarantee for one year after the date of purchase, at which time the guarantee would be removed provided (i) the loan was current; and
(ii) First Bank’s capital position was sufficient to satisfy FDIC. A discussion ensued, and a consensus of those in attendance appeared to agree to jointly and *17 severally guarantee the $4,000,000.00 loan for a twelve (12) month period.”
On November 12, 1984, a copy of a letter was sent to Holdco by Central. That letter stated in pertinent part:
“Gentlemen:
“Central Bank of the South has committed to extend the above-referenced loan to Holdco of Pinellas County upon condition that, among other things, the members of the investor group execute and deliver to Central personal continuing unlimited guaranties of Holdco’s indebtedness to Central. This letter is to advise you that Central will consider releasing the guaranties after the first anniversary of the funding of the Loan only if the following conditions have been met to the satisfaction of Central:
“1) The loan-to-book value of Holdco does not exceed 75%;
“2) It is evident to Central that Holdco is able for twelve consecutive months to (a) pay interest and principal on the Loan based upon a twelve-year amortization and (b) maintain a capital-to-asset ratio equal to the greater of 7% or that required by federal regulatory guidelines, solely from the earnings of First Bank of Pinellas County;
“3) Classified Assets of First Bank of Pinellas County, including assets classified as ‘Substandard’, ‘Doubtful’, and ‘Loss’ do not exceed 25% of the capital of First Bank of Pinellas County; and “4) The financial condition of First Bank of Pinellas County is satisfactory to Central.
“Notwithstanding anything to the contrary implied or contained herein, Central shall have the unqualified and unrestricted right at any time to demand payment of the entire outstanding balance of principal, interest and all other charges under the Loan.”
None of the guarantors contacted Central regarding the conditions of a release; instead, they relied on the assurances of Kelley that they would be released at the end of a 12-month period. Although they contend that they never read the above-quoted letter, it is not contested that the letter was sent to Holdco. A follow-up letter regarding the same issue and varying the terms slightly was also sent on November 23.
In January 1986, Kelley was asked to resign as president of McNulty Bank and as chairman of Holdco. His resignation was requested by Hawkins and Keelean after they discovered that he had sent a loan applicant to another bank and had claimed a finder’s fee upon the applicant’s receipt of the loan. In addition, Keelean and Hawkins had learned that Kelley had inflated his financial statements. Following Kelley’s resignation, Hawkins became chairman of Holdco and Richard Ackert became president of McNulty Bank. Kee-lean and Hawkins claim that after Kelley left Holdco and McNulty, Central Bank began to press them for further security on the $4,000,000 loan. Because, they say, they felt that Central Bank was positioning itself to call the loan, the debt was recolla-teralized. Hawkins agreed to pay $2,000,-000 on the note and to execute a promissory note in the amount of $300,000. Keele-an also signed a promissory note in the amount of $1,168,677.78, which was secured by his stock in a corporation operating a Buick automobile dealership. Hawkins assumed joint and several liability on the first $550,000 of the note signed by Keelean. The money that was borrowed by Hawkins and Keelean was to be applied to the $4,000,000 note. In return for the new security, Central Bank agreed to release the stock of McNulty Bank only to a bona fide purchaser, that purchaser to be selected solely by McNulty Bank. Despite the above-stated efforts, the balance on the $4,000,000 loan was called in June 1987. Central Bank thereafter sued on all of the notes, which were in default, and Keelean and Hawkins counterclaimed, arguing that Central Bank was guilty of fraud. Hawkins also filed a cross-claim against Keele-an for contribution. The trial court entered summary judgments in favor of Central Bank on the claims and counterclaims and declared those judgments final pursu *18 ant to Rule 54(b), A.R.Civ.P.[2]
Because this case was filed after June 11, 1987, the “substantial evidence rule” is the standard by which the propriety of a summary judgment is determined:
“On motion for summary judgment, when the movant makes a prima facie showing that no genuine issue of material fact exists, the burden shifts to the non-movant to show ‘substantial evidence’ in support of his position. The non-movant’s burden is now greater than in the past, because the scintilla rule has been abolished. See Rule 56(c), A.R.Civ.P.; § 12-21-12 [Ala.Code 1975]; Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794 (Ala.1989). On appeal from a summary judgment, an appellate court looks at the same factors that the court below considered in ruling on the motion. Smith v. Citicorp Person-to-Person Fin. Centers, Inc., ill So.2d 308 (Ala.1985).”
Bean v. Craig, 557 So.2d 1249, 1252-53 (Ala.1990). Central Bank made a prima facie showing that there was no genuine issue of material fact. Keelean and Hawkins contend that, in opposition to the motion for summary judgment, they offered substantial evidence tending to show that Kelley had acted as the agent of Central Bank and that the investors had been “lulled into” signing the guaranties. We disagree, finding that there was no evidence that Kelley was an agent of Central and finding no evidence that Central Bank had a duty to disclose any facts it knew or suspected regarding Kelley. Furthermore, there is no evidence of any fraud on the part of Central Bank.
The investors contend that the guarantors should not be forced to honor the guaranties because, they claim, Central Bank used Kelley as its agent in procuring their signatures. Their defenses against the claims by Central Bank, as well as the counterclaims, all hinge on whether, in fact, there is substantial evidence that Kelley was the agent of Central Bank. Therefore, because our resolution of this issue disposes of all issues relevant to this appeal, we will address that issue only. The investors contend that certain special circumstances exist that imposed a duty on Central Bank to disclose certain facts that, they say, would have caused them to refuse to sign the guaranties. At the outset, we note the following:
“When both parties are intelligent and fully capable of taking care of themselves and dealing at arm’s length, with no confidential relations, no duty to disclose exists when information is not requested, and mere silence is then not a fraud. There must be active concealment or misrepresentation. Mudd v. Lanier, 247 Ala. 363, 377, 24 So.2d 550, 562 (1945); quoted in Jim Short Ford Sales, Inc. v. Washington, [384 So.2d 83 (Ala.1980)]; accord, Berkel & Co. Contractors v. Providence Hospital, 454 So.2d 496 (Ala.1984).”
Bank of Red Bay v. King, 482 So.2d 274, 285-86 (Ala.1985).
However, § 6-5-102, Code of Alabama (1975), states:
“Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case.”
This Court has said:
“Under 6-5-102, mere silence is not fraud unless confidential relations or special circumstances exist; active concealment or misrepresentation must be present. Collier v. Brown, 285 Ala. 40, 228 So.2d 800 (1969).”
Berkel & Co. Contractors v. Providence Hosp., 454 So.2d 496, 505 (Ala.1984).
Keelean and Hawkins contend that “special circumstances” existed that imposed upon Central Bank a duty to impart to them any and all information it had regarding Kelley. While the investors contend that Kelley acted as the agent for Central Bank and as its agent convinced them to sign the guaranties, the evidence shows otherwise. Keelean indicated in his deposi *19 tions that he had been in the same Rotary Club with Kelley and that he also knew that Kelley was in the banking business. He also stated that he was first approached about the Holdco venture via a telephone call from Albert Geiger, who later came to his office with Kelley to propose the formation of a group to acquire a bank. There is simply nothing in the record to indicate that Central Bank was involved in any way with the solicitation of the investors for the Holdco venture. In addition, the record indicates that the board of directors of Holdco appointed Kelley to negotiate with Central Bank, or another bank, for funding for their venture. Keelean admits in his deposition that when Kelley negotiated with Central Bank, he was representing the investor group. Keelean also admits in his deposition that he never had any contact with anyone at Central Bank until after the balance on the $4,000,000 note had been called by the bank. Not one of the members of the investment group inquired as to any information the bank might have regarding their venture, nor did they solicit any information about Kelley. Instead, they simply elected Kelley as their representative and believed whatever he told them. In contending that Kelley represented Central Bank, the only possible “evidence” Keelean and the others have that Kelley might have been representing Central Bank was statements they say Kelley made to them implying that such a relationship existed. These facts do not indicate that Central Bank in any way deceived the members of the investment group; nor do they imply that Kelley was, in fact, an agent of Central Bank. In fact, they do not in any way constitute “special circumstances” sufficient to impose on Central Bank a duty of disclosure.
The parties’ briefs make much of the fact that Central Bank received, in effect, guaranties on unsecured “doubtful” loans it had made to First Bank because those loans were paid off by part of the $4,000,000 loan made to Holdco. This was disclosed in the closing, even though the members of the board claim that they did not receive or read a copy of the disclosure until after the closing itself. From our review of the depositions, we conclude that there is simply no evidence indicating that Central Bank considered Kelley, or used Kelley, as its agent, because, as admitted by Keelean, the board vested him with the responsibility of negotiating with the bank. The board members could have chosen someone else to be their representative or, in the alternative, they could have watched the “goings on” of Kelley more scrupulously. It is clear from the evidence that Kelley was not an agent of the bank; rather, it is clear that he represented the investment group, and that the members of that group, and they alone, were to blame for giving him the freedom to make so many of the decisions. Central Bank had no duty to “warn” them of Kelley’s prior bank dealings, nor did Central Bank have a duty to advise them that Kelley was making decisions that would ultimately affect their own well-being. They gave Kelley the authority to act on their behalf, and they cannot now shift to Central Bank the blame for their carelessness.
For the foregoing reasons, the summary judgments are affirmed.
AFFIRMED.
HORNSBY, C.J., and ALMON, STEAGALL and INGRAM, JJ., concur.

. Winstead and Geiger filed for bankruptcy while the cases were pending in the circuit court, and Slaughter filed for bankruptcy after this appeal was filed. Slaughter’s appeal has been stayed pending bankruptcy proceedings. Coone could not be located and was never served.

. The cross-claim is still before the trial court.