[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 323 
RaCON, Inc. the plaintiff below, appeals from a May 21, 2004, order of the Tuscaloosa Circuit Court entering summary judgments for the defendants on multiple claims. For the reasons stated herein, we affirm each of those judgments.
 I. Facts and Procedural History
In 1999 Tuscaloosa County ("the County") undertook a project to extend Mitt Lary Road ("the project"). The Alabama Department of Transportation ("ALDOT") funded the project. The County retained Burk-Kleinpeter, Inc. ("BKI"), to design the work and to serve as engineer for the project. The project contemplated that the road builder would cut certain slopes along the proposed roadway. BKI retained TTL, Inc., to analyze subsurface conditions and to perform consulting services for BKI on soil or other geotechnical conditions along the proposed roadway.
Following a field investigation, TTL issued an interim written report to ALDOT on November 1, 1999, stating that, given geologic formations and soil conditions in the area of the project, rock buttresses — structures in which large rocks known as riprap are placed over fabric, filter material — likely would be required to stabilize slopes along the proposed roadway after cuts in elevation were made. TTL reported to ALDOT that five areas along the road were of particular concern. TTL included a drawing of a rock buttress in its report to ALDOT. TTL's report further stated that the project engineer would need to examine soils exposed by the cuts and determine if, in its discretion, rock buttresses were required. TTL recommended that 100,000 tons of class 2 riprap stone, 200,000 yards of filter blanket fabric, and 6,000 feet of underdrain material be included in the bid specifications as the estimated quantities of material for use in constructing rock buttresses on the project.
Early in November 1999 the County invited RaCON and six other road builders to bid on the project. The bid package sent to those contractors included engineering plans and drawings, the contract agreement, instructions to bidders, and a bid-proposal form for the contractors to complete and return (those documents are referred to hereinafter collectively as "the contract documents").[2] *Page 324 
The bid-proposal form detailed various work operations and listed the estimated quantities of materials required for the project. That form, in pertinent part, reflected that the following quantities of materials were required: item 39-8,000 linear feet of underdrain pipe; item 40-103, 036 tons of class 2 riprap;[3] and item 41-202, 718 square yards of filter blanket. Adjacent to the total estimated quantities for each item were blank sections entitled "unit price" and "total price" that the bidders were to complete. Section 10 of the bid instructions described the procedure for payment of materials as follows:
 "10. Materials and Work: All materials, which engineering plans specify are required, will be installed as they are shown on the drawings, plans and/or specs.
 ". . . .
 "B. Quantities: The [estimated] quantities shown in the proposal shall be considered by the contractor as the quantities required to complete the work for the purpose of bidding. Should the actual quantities required in the construction of the work be greater or less than the quantities shown, an amount equal to the difference of quantities at the unit prices bid for the items will be added to or deducted from the contract total."
(Emphasis added.)
Three references to rock buttresses were encompassed in the documents in the bid package. First, project note 304 on sheet 2K of the engineering plans stated:
 "Quantities of loose riprap, filter blanket, and underdrain have been included to be placed as directed by the project engineer for rock buttresses."[4]
(Emphasis added.)
Second, a diagram displaying an engineered rock buttress was included as sheet 2J in the plans. This diagram did not reference any particular location on the project.
Third, in addition to those plans specific to the project, the contract documents incorporated the Alabama Highway Department Standard Specifications for Highway Construction (1992 Edition) ("the ALDOT specifications"). The stated purpose of ALDOT specification 219, entitled "Landslide Corrections," is to "cover the work of correcting a landslide in an existing roadway slope with the designated areas shown on the plans or directed by the Engineer." ALDOT specification 219.203(a) provides that the work needed to correct a landslide varies based on the site conditions. Construction of a rock buttress is one of several methods discussed in ALDOT specification 219.203(a) to correct landslides.[5]
Section 18 of the bid instructions appointed BKI, the project engineer, as the party to whom RaCON and the other bidders should address questions about plans, specifications, and the contract documents. That section stated: *Page 325 
 "18. Interpretation of Plans and Specifications. If any bidder contemplating submitting a bid for the proposed contract is in doubt as to the true meaning of any part of the plans, specifications or other proposed contract documents, he may submit to the Engineer . . . a written request for an interpretation thereof at least ten (10) days prior to bid opening. . . . Any interpretation of the proposed documents will be mode only by written addendum duly issued and a copy of such addendum will be mailed or delivered to each person receiving a set of such documents. The County . . . or Engineer will not be responsible for any other explanations or interpretations of the proposed documents."
(Emphasis added.) RaCON did not submit any written questions to BKI concerning the plans and specifications for the project,
Keith Andrews, vice president of RaCON, analyzed the bid package. After receiving that package, Andrews was aware that rock buttresses might be required by BKI on the project. According to Andrews, RaCON undertook the following investigation during November 1999 to analyze the likelihood that rock buttresses would be constricted on the project:
 (1) RaCON reviewed ALDOT specification 219 and concluded that rock buttresses were used only to remedy actual slope failures, not prevent landslides;
 (2) Andrews learned from TTL that, in TTL's preliminary analysis for ALDOT, TTL had identified five areas along the proposed roadway where TTL had particular concern that soil conditions might become unstable;
 (3) Andrews did a field investigation of the five areas of concern identified by TTL and, based on RaCON's knowledge of soils in those areas and experience as a road builder, concluded that (a) rock buttresses likely would not be needed to remedy any slope failures that might occur in those areas, and (b) utilization of underdrains and slope restoration — methods that are less costly than constructing rock buttresses — likely could remedy any slope failures; and
 (4) prior to bidding, Andrews had conversations with Jeff Wood of BKI and Jim Bamberger of TTL in which both Wood and Bamberger allegedly assured Andrews that (a) ALDOT specification 219 applied to the project; (b) RaCON's interpretation of ALDOT specification 219, i.e., that rock buttresses were intended as remedial, not preventive, structures to correct actual slope failures, was accurate; and (c) rock buttresses would be required only as a last resort on the project if less costly measures (e.g., installation of above ground or subsurface drainage systems) failed to correct a landslide.
The alleged representations by TTL and BKI described in paragraph 4 are referred to collectively as the "pre-bid representations." The pre-bid representations by BKI and TTL were not documented in writing or incorporated into the contract.
In November 1999 RaCON and six other bidders submitted bid proposals to the County for the project. RaCON's proposal stated a unit price and total cost of zero for item 40, loose class 2 riprap, and item 41, filter blanket material. Andrews attested that, based on RaCON's interpretation of ALDOT specification 219, its field investigation, and the pre-bid representations, RaCON "zero bid" item 40 because it was willing to take a commercial risk that there would be no slope failures on the project that would require the use of *Page 326 
riprap to construct rock buttresses.[6] The other six bidders on the project all submitted bids stating total prices for item 40 (the riprap material specified by TTL for construction of rock buttresses) ranging from approximately $1.3 million to approximately $2.2 million.[7]
When the bids were opened on November 23, 1999, RaCON's proposal to complete the entire project for $7.3 million was the low bid.[8] Wood (a professional engineer employed by BKI) testified in deposition that, after noting that RaCON bid zero on item 40, he spoke with Andrews and asked if RaCON was aware that an estimate of 100,000 tons of riprap was included for rock buttresses on the project. Wood testified that Andrews responded affirmatively to that inquiry.
Thereafter, on November 30, 1999, Andrews sent the following letter to Wood:
 "Dear [Mr. Wood]:
 "Pursuant to your request, RaCON, INC. hereby acknowledges its obligation to perform necessary remedial work on . . . the [p]roject in the event slides should occur under the conditions depicted in the Rock Buttress Detail on plan sheet 2J. Slope stabilization or other remedial work, when required will be performed in accordance with the applicable plans and specifications and/or generally accepted methods of construction. . . .
 "Sincerely,
 "/s/ Keith Andrews
 "Keith Andrews
 "Vice President [RaCON]"
Wood sent the following response to Andrews that same day:
 "Dear [Mr. Andrews]:
 "In receipt of your letter dated November 30, 1999, your obligation is to place riprap and construct rock buttresses where the possibility of slides exists or as directed by the engineer.
 "If you have questions, please let me know.
 "Sincerely,
 "BURK-KLEINPETER, INC.
 "/s/ O. Jeffrey Wood
 "O. Jeffrey Wood, P.E."
After receiving this letter, Andrews stated that he understood that BKI meant that (a) there was a possibility of a slide on the project, and (b) if a slide actually occurred, RaCON might be directed by BKI to construct a rock buttress to correct the slide.
After RaCON was awarded the project, Keith Andrews, on behalf of RaCON, went to BKI's office on December 1, 1999, to sign the contract. Mack Roberts, director of ALDOT, was present at BKI's office. Andrews asserted that, before signing the contract, he discussed with Roberts RaCON's decision to "zero bid" item 40. Andrews attested that he was advised by Roberts that ALDOT specification 219 (which purportedly indicates that rock buttresses are used as remedial, not preventive, measures) would apply if any rock *Page 327 
buttresses were built on the project. Andrews signed the contract on RaCON's behalf after his conversation with Roberts. Andrews testified that he had received and read BKI's November 30, 1999, letter before signing.
Three slope failures occurred during RaCON's preliminary construction work. Andrews testified that RaCON successfully remedied those slope failures by installing underground drains.
In early May 2000 RaCON was furnished the first of 14 designs by TTL for rock buttresses to be constructed along the proposed roadway. At a meeting among representatives of RaCON, BKI, TTL, and the County held on May 1, 2000, BKI directed RaCON to construct rock buttresses. The 14 locations included several locations where RaCON previously had installed underground drainage systems to address slope failures. Andrews stated that he told participants at the May 2000 meeting that the directive to construct rock buttresses to prevent slides was inconsistent with the pre-bid representations. Further, in correspondence to BKI dated May 5, 2000, RaCON stated that the directive to construct the 14 rock buttresses conflicted with its pre-bid understanding that, those structures would be used only as a last resort to remedy an actual slope failure.
RaCON constructed the 14 rock buttresses under protest. Claiming that the construction of those rock buttresses was extra work not contemplated in the contract, RaCON sent the County a bill in August 2001 for $1.06 million for that work. That billing indicates that approximately 71,000 tons of riprap were used to construct the 14 rock buttresses,[9] that the total cost of materials for that work was approximately $700,000 ($576,000 for materials and $124,000 for hauling expense), and that RaCON incurred approximately $91,000 in labor expense and $274,000 in equipment costs to build the structures. The County did not pay RaCON's $1.06 million bill for the construction of the rock buttresses.
The contract initially obligated RaCON to relocate utility lines along the proposed roadway. However, the County assumed that responsibility after the contract had been executed. A gas pipeline operated by Sonat, Inc., was located at Stations 163-170 of the project. On December 12, 2000, RaCON sent correspondence to the County stating that the County's failure to timely make arrangements to relocate the Sonat gas pipeline had prevented access to that area of the project. Because RaCON's equipment was idled, that letter demanded that the County reimburse RaCON for idle-equipment costs allegedly incurred from October 16 through November 13, 2000, as a result of delays by the County in relocating the Sonat gas pipeline ("the utility-delay claim"). The County did not pay the utility-delay claim.[10]
On January 16, 2002, RaCON sued the County, BKI, and TTL in the Tuscaloosa Circuit Court, seeking damages resulting from its work on the project. The following *Page 328 
claims were made in RaCON's first amended complaint:
 Count I-Breach of Contract Against the County/Restricted Access: RaCON claimed that the County owed RaCON $1.5 million under this claim for idle-equipment expense attributable to the delays by the County during 2000 in securing access to properties along the proposed roadway and in relocating utility facilities.
 Count II-Breach of Contract Against the County/Rock Buttresses: RaCON claimed damages of $1.06 million from the County for constructing 14 rock but-tresses that it alleges was extra work not initially contemplated in the contract.
 Count III-Breach of Contract Against the County/Failure to Pay Retainage and Interest:
RaCON claimed damages of $178,103 for retainage withheld by the County following acceptance of RaCON's work and interest of at least $43,000 on all amounts unpaid by the County.
 Count IV-Negligence Claims Against BKI and TTL: RaCON claimed unspecified damages from BKI and TTL on the theory that BKI and TTL breached duties owed to RaCON by (a) negligently preparing vague, ambiguous, and defective plans for the project, (b) negligently conducting tests on soil conditions on the project and determining that rock buttresses were required when other less costly procedures contemplated under ALDOT specification 219 could have been used, (c) negligently designing the rock-buttress structures, and (d) failing to exercise sound engineering practices in oversight and inspection of RaCON's work.
 Count V-Misrepresentation Claims Against BKI, TTL, and the County: RaCON claimed unspecified damages from the County, BKI, and TTL based on allegations that, before the execution of the contract, those defendants fraudulently misrepresented to RaCON that ALDOT specification 219 applied to the project, that rock buttresses were intended only to correct actual slope failures, that the less costly methods stated in ALDOT specification 219 would be attempted before RaCON would be directed to construct rock buttresses, and that rock buttresses would be used on the project only as a last resort.
In August 2003 the County filed a motion for a summary judgment on count I (the idle-equipment/access claim), count II (the rock-buttress claim), and count V (the misrepresentation claim). The trial court granted the County's motion on May 21, 2004, with respect to count II and count V. With respect to the breach-of-contract claim based on idle-equipment/access (count I), the trial court granted the County's motion with respect to RaCON's utility-delay claim, but it denied the County's motion on RaCON's claim against the County arising from delays between March 2000 and July 2000 in securing access over other properties.
In August 2003 TTL and BKI also filed motions for a summary judgment on the negligence (count IV) and misrepresentation (count V) claims. In its May 21, 2004, order entering a summary judgment for the County, the trial court granted TTL's motion as to both claims asserted against TTL, granted BKI's motion on the misrepresentation claim, and denied BKI's motion on the negligence count.[11] *Page 329 
Pursuant to Rule 54(b), Ala. R. Civ. P., the trial court, certified as final its judgment on all claims on which it granted summary judgment for the County, TTL, and BKI. We now consider RaCON's arguments that the trial court erred in entering those judgments.
 II. Standard of Review
The well-settled standard of review for a summary judgment was stated recently in Prince v. Poole, 935 So.2d 431
(Ala. 2006).
 "This Court's review of a summary judgment is de novo. We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P. In making such a determination, we must review "he evidence in the light most favorable to the nonmovant. Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce `substantial evidence' as to the existence of a genuine issue of material fact. Ala. Code 1975, § 12-21-12. `[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'"
935 So.2d at 442 (citations to cases omitted). Further, when reviewing a summary judgment, this Court resolves all reasonable doubts against the movant. Prowell v. Children's Hosp. ofAlabama 949 So.2d 117, 126 (Ala. 2006).
 III. Claims on which Summary Judgment Was Entered A. Breach-of-Contract/Rock-Buttress Claim Against the County
RaCON argues that the trial court erred when it entered a summary judgment against RaCON on its $1.06 million claim against the County to recover the expense of constructing the 14 rock buttresses. In May 2000, BKI directed RaCON to build those structures in the manner designed by TTL. RaCON constructed the rock but-tresses under protest and thereafter billed the County for this work. This breach-of-contract claim assumes that construction of rock buttresses was extra work not initially contemplated in the contract.
The contract incorporated the ALDOT specifications for highway construction. RaCON contends that ALDOT specification 219 limits a contractor's obligation to build a rock buttress to a situation where a slope actually fails. RaCON argues that, in multiple locations on the project, BKI required RaCON to build rock buttresses in 2000 to prevent, not to remedy, slope failures. In those locations where slope failures actually occurred in 2000, RaCON further asserts that BKI's directive to build rock buttresses was contrary to the pre-bid representations that those structures would be constructed only as a last resort if less costly construction methods would not stabilize slope failures. RaCON argues that a summary judgment on its rock-buttress claim was improper because, at a minimum, genuine issues of material fact existed as to whether BKI's directive to build the 14 rock buttresses was "extra work" based on RaCON's interpretation of ALDOT specification 219 (i.e., that rock buttresses are not to be used as preventive *Page 330 
structures) and on the pre-bid representations. The County argues that the contract obligated RaCON to build preventive rock buttresses as directed by the project engineer.
The trial court concluded that the "meaning and purpose of the contract as to the purpose and use of rock buttresses could not be resolved on summary judgment. . . ." Instead, it ruled that Article V.E. of the contract barred RaCON's rock-buttress claim. In pertinent part, that provision states:
 "E. Errors and Omissions: [RaCON] does agree to release and hold harmless [the] County . . . from any damages claimed by [RaCON] . . . resulting from or attributable in whole or part to, errors in or omissions of the plans and specifications, including final drawings of the Engineer/Architect or other design professionals. . . ."
The County argues that RaCON released its rock-buttress claim under Article V.E. because the essence of that claim relates to alleged deficiencies and misrepresentations as to project plans and specifications. Among other arguments, RaCON contends that Article V.E. is inapplicable to its rock-buttress claim, and, even though RaCON alleges in count V of its complaint that the project plans were negligently prepared, that Article V.E. does not prevent RaCON from pleading alternative theories of recovery.
The trial court ruled that RaCON had released the rock-buttress claim under the errors-and-omissions clause in Article V.E. of the contract because that claim is an action for "damages . . . resulting from or attributable to, in whole or part, from errors in or omission of [project] plans and specifications." We need not decide, however, whether the trial court properly applied and interpreted Article V.E.[12]
RaCON's rock-buttress claim is based on its interpretation of ALDOT specification 219 and the pre-bid representations. When considering several complementary provisions in the contract documents and the uncontested facts, we agree with the County that the plain meaning of the contract obligated RaCON to build the contested 14 rock buttresses with no additional cost to the County beyond the contract price. Three points are particularly persuasive to our holding in this regard.
First, RaCON's reliance on its interpretation of ALDOT specification 219 fails to consider the contractual provisions that reconcile apparent inconsistencies between the contract documents. ALDOT specification 219 is a standard guideline for highway construction. Paragraph 2 of addendum number 1 to the contract for this project states:
 "Where the State of Alabama Highway Department Standard Specifications for Highway Construction, 1992 Edition, differ from the Contract Documents and Specifications herein, the Contract Documents and Specifications shall take precedence. . . . The entire ALDOT Standard Specifications for Highway Construction, 1992 Edition, will be applied to this project except where it differs from the Contract Documents and Specifications."
(Bold typeface and emphasis in original.) Similarly, other provisions of the contract direct that, in determining the intent of the contract, plans that are specific to the project control over more general terms. *Page 331 
ALDOT specification 105.04, which states as follows, is one of those provisions:
 "105.04 Coordination of Plans, Specifications and Special Provisions.
 "(a) GENERAL.
 "These [ALDOT] specifications, the supplemental specifications, the plans, special provisions and all supplementary documents are essential parts of the contract, and a requirement occurring in one is as binding as though occurring in all. They are intended to be complimentary [sic] and to describe and provide for a complete work. In case of discrepancy, . . . [p]lans shall govern over Standard Specifications. . . ."
(Emphasis added.) Article I.C. of the contract further provides that, in the event of a conflict in the contract documents, technical specifications take precedence over general specifications. Considering all these provisions in parimateria, ALDOT specification 21 is not controlling if the specific plans and specifications for the project obligated RaCON to build the rock buttresses.
Second, RaCON may not rely on BKI and TTL's oral, pre-bid representations when asserting its rock-buttress claim against the County. The contract contains the following integration clause in Article I.D.I:
 "Integration: This Agreement, together with all documents which constitute the `Contract Documents,' constitute the entire agreement of the parties, as a complete and final integration thereof with respect, to its subject matter. All understandings and agreements heretofore had between and among the parties are merged, into this Agreement, which alone fully and completely expresses their understandings. No representation, warranty, or covenant made by any party which is not contained, in this Agreement or expressly referred to herein has been relied on by any party in entering into this Agreement."
(Emphasis added.) Even assuming that BKI and TTL made the pre-bid representations that purportedly limited RaCON's obligation to build rock buttresses, the integration clause required that those representations be memorialized to survive and to constitute a part of the contract. We find no references to those pre-bid representations in the contract. Accordingly, the pre-bid representations by BKI or TTL are not to be considered in evaluating RaCON's rock-buttress claim against the County.
Third, the plans specific to this project clearly state that RaCON would be required to construct rock buttresses. Note 304 on sheet 2K of the engineering plans stated that"[q]uantities of loose riprap, filter blanket, andunderdrain have been included to be placed as directed by theproject engineer for rock buttresses." (Emphasis added.) Andrews, RaCON's vice president, was aware of note 304 before RaCON submitted its bid and then executed the contract. Additionally, sheet 2J of the plans given to RaCON contained a diagram detailing a typical rock buttress.
Moreover, item 40 (class 2 riprap) and item 41 (filter blanket) in the bid-proposal form contained estimated quantities of materials needed to construct the rock buttresses. The bidders were advised in bid instruction 10.B. that the "quantitiesshown in the proposal shall be considered by the contractor asthe quantities required to complete the work for the purpose ofbidding." (Emphasis added.) When returning their responses, the bidders were to insert prices for the estimated quantities of materials and work items on the project. This process allowed the County to consider competing bids, and the engineer and bidders to plan the project, *Page 332 
without knowing the precise expenditure for each work item.[13]
After RaCON zero bid items 40 and 41 and became the low bidder on the project, Wood, a professional engineer for BKI, spoke with Andrews about the requirement for rock buttresses before RaCON signed the contract. In his deposition, Wood gave the following testimony about that conversation:
 "Q. What did you tell Keith [Andrews, RaCON's vice president, after the bids were opened]?
 "A. I told him I wanted to make sure that [he] understood that, you know, one hundred thousand tons of riprap is for the rock buttresses, and at that time, he said yes, he understood that. And I said, we are going to put in what we need to, you know, no more, no less. I said [the estimated volume is] our best estimate, and he said he understood. . . ."
While the plans given to bidders did not delineate the precise location of the intended rock buttresses, it is uncontested that bidders on the project were apprised of plans to use those structures "as directed by the project engineer."
(Emphasis added.)
In addition, the contract documents contemplated that the project engineer would make the final determination as to the protections against possible slope failures. Before signing the contract, BKI sent Andrews a letter dated November 30, 1999, stating that the contract would obligate RaCON "to place riprap and construct rock buttresses where the possibility of slides exists or as directed by the engineer." (Emphasis added.) This communication affirmed that RaCON had the commercial risk under the contract to build the 14 rock buttresses that BKI later directed RaCON to construct.
In summary, considering note 304 on sheet 2K in the plans, the diagram of a rock buttress in sheet 2J, the bid-proposal form specifying materials required to construct rock buttresses, bid instruction 10.-B., and the above-discussed contract provisions, the contract documents clearly and unambiguously obligated RaCON, at the direction of the project engineer, to construct the 14 rock buttresses without the County's paying RaCON any compensation over amounts stated in RaCON's proposal. Because under the explicit terms of the contract documents note 304 on sheet 2K and other project-specific plans control over general specifications, we reject RaCON's argument that ALDOT specification 219 limited, or created a jury question concerning, RaCON's obligations to construct the rock buttresses. Further, the pre-bid representations allegedly limiting the extent of RaCON's obligations to build rock buttresses merged into the contract pursuant to the integration clause and cannot be used in interpreting the contract as it relates to the rock-buttress claim. Because the rock buttresses were not "extra work" added by the County after RaCON signed the contract, the trial court's summary judgment for the County on RaCON's *Page 333 
rock-buttress claim in count II is affirmed.[14]
 B. Negligence Claim Against TTL
RaCON alleges that TTL was negligent in recommending the use of and designing rock buttresses to prevent slope failures or to remedy several landslides on the project. RaCON submitted the expert opinion of David Been, a civil engineer, in opposition to TTL's motion for a summary judgment. Been attested that TTL had failed to use the ordinary skill and care of a geotechnical engineer when TTL (a) concluded that soil conditions were unstable in the locations where the 14 rock buttresses were constructed, (b) improperly performed a computer analysis of soil conditions in those areas, (c) refused to recommend the use of underdrains or other less costly methods as an alternative to rock buttresses, and (d) erroneously determined that rock buttresses were required to prevent potential or actual slope failures on the project.
The trial courts order granting TTL's motion for a summary judgment on RaCON's negligence claim stated, in pertinent part:
 "5. TTL argues that RaCON was contributorily negligent in how it interpreted the contract documents, that RaCON had a duty to follow TTL's rock buttress design, that TTL was not the proximate cause of RaCON's damages, and that TTI, was not negligent. RaCON argues that none of these arguments applied under the facts of this case, that genuine issues of fact preclude summary judgment, that TTL had a duty not to act negligently as to RaCON and that it breached that duty. The Court finds that, even if TTL was negligent in determining whether preventive rock buttresses were required, such negligence would harm the County, not RaCON and further that RaCON assumed the risk. The Court therefore grants summary judgment for Defendant TTL as to RaCON's negligence claims against TTL."
(Emphasis added.)
On appeal, RaCON and TTL address the meaning of the trial court's holding that TTL's negligence "would harm the County, not RaCON." RaCON argues that, if the trial court held that RaCON's claim was barred by its contributory negligence, the summary judgment for TTL on count IV should be reversed because determinations as to whether a party has been contributorily negligent usually are reserved for the jury. Arguing that there was substantial evidence indicating that RaCON executed the contract with knowledge that it had an obligation to construct rock buttresses, TTL asks this Court to hold that RaCON's own negligence in reviewing the contract documents and in bidding zero for the rock-buttress materials bars its recovery.[15] *Page 334 
The trial court's determination that TTL's "negligence would harm the County, not RaCON" is essentially a finding that TTL owed no legal duty to RaCON. It is axiomatic that the defendant in a negligence action must have a duty to the claimant. Exparte CSX Transp., Inc., 938 So.2d 959, 962 (Ala. 2006). Whether a party owes a duty to another is strictly a question of law. Taylor v. Smith, 892 So.2d 887, 891 (Ala. 2004).
The uncontested facts pertinent to count IV are as follows. The County retained BKI as engineer for the project. In turn, BKI contracted with TTL for TTL to provide geotechnical services for soil conditions along the proposed roadway. TTL stated in its early November 1999 pre-bid report that "rock buttresses will likely be required at several locations along the alignment to stabilize the slopes." TTL recommended early in November 1999 that the engineering plans for the project should require the construction of rock buttresses as directed by the project engineer. TTL also estimated certain volumes and specified types of material (i.e., riprap and filter blanket) that the contractor selected to complete the project should use to construct those structures. To the extent noted in the facts stated above, BKI incorporated TTL's recommendations concerning rock buttresses into the plans and specifications for the project, and the bid instructions specifically stated that large quantities of material for the construction of rock buttresses "shall be considered by the contractor as the quantities required to complete the work for the purpose of bidding." The bid process also included an equitable method for comparing the competitive bids and for adjusting the price to be paid to the contractor should more or less than the estimated quantities of material be necessary to construct the rock buttresses the engineer would require.
Beginning in early May 2000 TTL designed the first of 14 rock buttresses and commenced specifying the locations on the project where, in TTL's judgment, those structures were needed to prevent slope failures. For purposes of reviewing the summary judgment, we assume that TTL knew that RaCON had bid zero for the rock-buttress materials when TTL designed the structures and specified those locations.
RaCON and TTL acknowledge that this Court has rejected the absence of privity of contract as a defense to a negligence claim against a party to a construction project. Berkel Co. Contractors, Inc. v. Providence Hosp.,454 So.2d 496, 501 (Ala. 1984). This Court held in Berkel that a subcontractor retained by the general contractor to install foundational pilings for a building could assert a negligence claim against the owner, Providence Hospital, for expenses incurred by the subcontractor in performing that work.454 So.2d at 503. The Berkel Court noted six factors that should be analyzed to determine whether a party not in privity with the claimant owes the claimant a duty of care in a construction setting. Those six factors are as follows:
 "`"(1) [T]he extent to which the transaction was intended to affect the other person; (2) the foreseeability of harm to him; (3) the degree of certainty that he suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury; (5) the moral blame *Page 335 
attached to such conduct; and (6) the policy of preventing future harm."'"
454 So.2d at 503 (quoting Howe v. Bishop,446 So.2d 11, 15 (Ala. 1984) (Torbert, C.J., concurring in the; result), quoting in turn United Leasing Corp. v. Miller, 45 N.C.App. 400, 406-07, 263 S.E.2d 313, 318 (1980)).
In Berkel the subcontractor encountered considerable difficulties installing the pilings in the manner specified in the original plans and presented evidence indicating that those specifications were defective. The Berkel Court concluded that, when the owner of the project site and architects changed specifications and directed continuation of the work, the owner owed a duty to the subcontractor for expenses incurred by the subcontractor in performing the work under the original plans.[16] 454 So.2d at 500, 503.
Unlike Berkel the complaint against TTL here does not concern alleged deficiencies in the: design of the rock buttresses RaCON constructed. The gist of RaCON's claim is that TTL was negligent in recommending "he use of any of those structures on the project to prevent slope failures or to remedy slope failures that had occurred.
In determining whether TTL owed RaCON a duty under the multifactor test in Berkel, we first consider the extent to which the transaction was intended to affect RaCON.[17] In this analysis we consider the entire transaction (which included the bid process and the contract documents) and do not, as RaCON argues we should, limit our focus to TTL's decision to require the construction of rock buttresses or the alleged damage to RaCON that resulted from that decision.
During the bid process, TTL's principal role was to assist BKI in developing specifications that would prevent or remedy slope failures. When TTL stated in its November 1999 report that "rock buttresses will likely be required," the project had not been released for bid and TTL had no reason to anticipate that RaCON would perform the contract. Indeed, all the bidders were advised to include prices in their bids for 103,000 tons of riprap and 202,000 square yards of filter blanket, which quantities approximated the amount of materials needed for constructing buttresses. The contract also included a mechanism whereby, notwithstanding the number of rock buttresses that were required by the project engineer, the compensation to the contractor would be adjusted based on the quantities of materials it actually used to build those structures.[18]
None of the applicable Berkel factors indicate that, in the bidding phase of the project, TTL owed a duty to RaCON. *Page 336 
TTL's professional opinions were intended to aid BKI in advising the County as to methods to prevent slope failures. The rendering of those opinions was wholly neutral to all bidders, including RaCON.[19] Further, in the bid process, harm to RaCON was not foreseeable; certainty of injury to RaCON did not exist; and there was no connection between TTL's conduct and any damage to RaCON arising from TTL's recommendations to BKI on behalf of the County.[20] Moreover, the commencement of work by TTL in the spring of 2000 to design and specify the locations of the rock buttresses merely implemented TTL's recommendation in its pre-bid report that "rock buttresses will likely be required."
In summary, viewing TTL's role in the project over the entirety of the transaction and applying the Berkel factors, we conclude that TTL did not owe RaCON a duty of care. The trial court's summary judgment on RaCON's negligence claim against TTL is affirmed.[21]
 C. Misrepresentation Claim Against All Defendants
RaCON alleges that the County, BKI, and TTL all misrepresented to RaCON that it would have to construct rock buttresses as a last resort to remedy actual slope failures only after RaCON had attempted other, less costly, construction methods. Claims based on those alleged misrepresentations were first asserted in RaCON's January 16, 2002, complaint.
A two-year statute of limitations applies to fraud actions. Ala. Code 1975, § 6-2-3. That limitations period begins to run when the claimant discovers the fraud. Id. In Alabama, fraud is discoverable as a matter of law when a claimant receives documents that put him or her on notice that the fraud reasonably should be discovered. Liberty Nat'lLife Ins. Co. v. Parker, 703 So.2d 307, 308 (Ala. 1997).
Before signing the contract on December 1, 1999, Andrews received and read a letter from BKI dated November 30, 1999, in which the project engineer stated that RaCON's "obligation is to place riprap and construct rock buttresses where the possibility of slides exists or as directed by the engineer." Entering summary judgments on the misrepresentation claims against all defendants, the trial court ruled that BKI's letter was "sufficient to put RaCON on notice under Alabama Code [1975, § 6-2-3,] of the fact constituting the alleged misrepresentation." Because RaCON's misrepresentation claims were asserted more than two years after BKI's letter, the trial court held that those claims were time-barred.
RaCON argues that it did not discover the alleged fraud until its May 1, 2000, meeting with the defendants at which RaCON was directed to construct 14 rock buttresses. RaCON's misrepresentation claims would not be time-barred if its cause of action for fraud accrued on May 1, 2000. RaCON further argues that a material *Page 337 
issue of fact exists as to whether the fraud cause of action accrued on its receipt of BKI's November 30, 1999, letter, because, it says, the terms in that letter were ambiguous.
We reject RaCON's arguments. The plain meaning of BKI's November 30, 1999, letter was that RaCON would have an expansive obligation to construct rock buttresses where the possibility of slides existed or where the engineer directed. BKI's statements in that correspondence unquestionably are inconsistent with RaCON's alleged pre-bid understandings that rock buttresses were for remedial, not preventive, purposes, and would be constructed only as a Last resort to remedy actual slope failures.
RaCON further attempts to save its misrepresentation claims by relying on Potter v. First Real Estate Co.,844 So.2d 540 (Ala. 2002). RaCON argues that Potter stands for the proposition that the statutory limitations period for a fraud action does not run if, following the discovery of a misrepresentation, a party thereafter renews the misrepresentations to the claimant. Specifically, RaCON argues that, before it signed the contact, Mack Roberts, director of ALDOT, made statements to Andrews on December 1, 1999, reaffirming alleged earlier representations to RaCON that it would have a limited obligation to construct rock buttresses. Because this alleged reaffirmation occurred after BKI's November 30, 1999, letter, RaCON contends that, under Potter, a fact question exists as to whether the cause of action for fraud accrued on May 1, 2000. We also reject this argument.
The facts here concerning Roberts's alleged reaffirmation of fraud are distinguishable from those in Potter. The reaffirmation of the alleged fraud in Potter occurred when a real-estate agent, a defendant in that case, reassured the plaintiffs that the house they were purchasing was not located in a flood plain.[22] Here, neither Roberts nor ALDOT were parties to the contract, neither made the alleged misrepresentations on which RaCON's fraud claims are based, and Roberts did not represent any of the defendants at the December 1, 1999, meeting at which the contract was executed. A statement from Roberts, a third party, allegedly reaffirming fraudulent statements by the defendants can hardly be binding on the defendants or toll the statute of limitations that began running for RaCON upon receipt of BKI's November 30, 1999, letter.
RaCON received and read BKI's November 30, 1999, letter before it signed the contract the following day. We hold that no later than November 30, 1999, RaCON was in possession of facts that would put it on notice that the defendants had misrepresented RaCON's duties to construct rock buttresses. Because RaCON's misrepresentation claims were filed more than two years after November 30, 1999, the trial court's summary judgments are affirmed with respect to the fraud claims against all of the defendants.
 D. Utility-Delay Claim Against the County
RaCON alleges in count I that it incurred idle-equipment costs not contemplated in the contract when the County *Page 338 
failed to timely secure rights-of-way over certain properties and to relocate a Sonat gas pipeline in the path of the proposed roadway. In its utility-delay claim related to the Sonat gas pipeline, RaCON specifically seeks damages for idle-equipment expense of $106,443 for costs incurred from October 16 through November 13, 2000. The County moved for a summary judgment on all delay claims by RaCON asserted in count I. The trial court partially granted the County's motion and entered a summary judgment against RaCON on the utility-delay claim, but denied the County's motion with respect to RaCON's claims arising from the County's delays in securing access over other properties.[23]
The trial court referenced Article III.A. of the contract in its order entering a summary judgment for the County on the utility-delay claim. That portion of the contract, commonly known as a "no-damages-for-delay" clause, states, in pertinent part:
 "Delay. If [RaCON] is delayed at any time in the progress of work by any of the following causes, [RaCON] may be entitled to a reasonable extension of time as determined by the County in which to complete the Project. Provided, however, no such delay nor the extension of time if granted shall be grounds for a claim by [RaCON] for damages or for additional cost, expense, overhead or profit or other compensation:
 "1. Fires, abnormal floods, tornadoes or other cataclysmic phenomenon of nature.
 "2. Strikes, embargoes, lockouts, war, [and] acts of public enemy.
 "3. Change orders.
 "4. Acts of performance or delays in performance by other contractors.
 "5. Causes beyond the control of [RaCON].
 "Provided further, that [RaCON] shall immediately give notice in writing to the County and follow extension of time procedures as provided for herein. The County expressly disclaims any liability to [RaCON] for any cost, expense or damage causes by other contractors, including those engaged by the County. The County shall not be liable for damages or cost to [RaCON] sustained due to any interference from utilities or appurtenances or from the operations of relocating the same."
(Emphasis added.) The trial court specifically relied on the last sentence in Article III.A. when it entered a summary judgment for the County on RaCON's utility-delay claim.
When the contract was executed, RaCON initially was obligated to relocate, and was to receive compensation for relocating, utility facilities along the path of the proposed roadway. However, RaCON asserts that the parties orally amended the contract after it was signed so that responsibility for relocating utility facilities shifted to the County.[24] After that oral amendment, RaCON contends, the County had the responsibility to relocate utility facilities in a timely manner and RaCON repeatedly notified the County that its failure to relocate the Sonat gas pipeline was interfering with RaCON's work.
The County asserts that the parties could not have orally modified the contract because Article I.D.2. requires *Page 339 
that any amendment to the contract be in a writing executed by the parties. We disagree. The County undertook to relocate utility facilities after the alleged oral amendment. This Court stated in Ex parte Coleman, 861 So.2d 1080 (Ala. 2003), that, under Alabama law, proof of an oral modification of a contract is allowed, notwithstanding a provision that oral changes following its execution were not binding.861 So.2d at 1082, 1084. That holding is based on the premise "that a party who has included . . . a provision [barring oral modifications] in a contract for that party's benefit can certainly waive that provision." 861 So.2d at 1084. Under these facts, when the County actually performed work pursuant to the oral understanding, the County cannot assert that an oral agreement to shift responsibility for the relocation of utility facilities was ineffectual.
The parties dispute the effect of the no-damages-for-delay provision in light of the oral amendment. The County argues that the summary judgment on the utility-delay claim should be affirmed because the language in Article III.A. released the County from that claim. RaCON contends that the no-damages-for-delay clause was not applicable after the County assumed responsibility to move the Sonat gas pipeline, because, by implication, that amendment nullified the last sentence of Article III.A. or otherwise introduced ambiguities into its application to the relocation of the Sonat gas pipeline RaCON argues that there are material issues of fact concerning the utility-delay claim that should be presented to the jury.
We reject RaCON's argument that the last sentence or any other provision in Article III.A. was deleted by implication following the transfer of responsibility for relocation of utility facilities. RaCON has presented no facts to support its argument that the parties so intended to modify Article III.A.
Assuming the no-damages-for-delay clause here remained effective after the oral amendment, RaCON cites two cases,E.C. Ernst, Inc. v. Manhattan Constr. Co.,551 F.2d 1026 (5th Cir.1977) (interpreting Alabama law), andMississippi Tramp. Comm'n v. SCI, Inc. 717 So.2d 332
(Miss. 1998), that provide limited latitude for damage claims resulting from delay despite the existence of a no-damages-for-delay clause. The United States Court of Appeals for the Fifth Circuit stated in Ernst:
 "[Before us is] a reformulation of the common "no damage clause in construction contracts whereby one party contractually limits its own liability for delay damages. Although the Alabama courts have not ruled on the validity of such provisions, their validity is now well established. See generally Peter Kiewit Sons' Co. v. Iowa Southern Utilities Co., 355 F.Supp. 376, 396-401 (S.D.Iowa 1973). Given their harsh effect, courts will strictly construe such provisions but generally enforce them absent delay (1) not contemplated by the parties under the provision, (2) amounting to an abandonment of the contract, (3) caused by bad faith, or (4) amounting to active interference."
551 F.2d at 1029 (footnotes omitted). Similarly, theMississippi Transportation court observed that, while no-damages-for-delay clauses are generally enforceable, claims could be asserted under the following exceptions if the party seeking their benefit attempts to avoid payment of damages for a delay that
 "(1) was not intended or contemplated by the parties to be within the purview of the provision; (2) resulted from fraud, misrepresentation, or other bad faith on the part of one seeking the benefit of the provision; (3) has extended such an unreasonable length of time that the party delayed would have been *Page 340 
justified in abandoning the contract; or (4) is not within the specifically enumerated delays to which the clause applies."
717 So.2d at 338. We are unaware of any decision of this Court interpreting a no-damages-for-delay provision.
RaCON argues that, notwithstanding Article III.A., its utility-delay claim is actionable because, it says, the delay was "not contemplated by the parties," a ground for an exception noted in Ernst and Mississippi Transportation.
Here the parties specifically anticipated the very type of delay at issue — utilities relocation — in the last sentence of Article III.A. Hence, the utility-delay claim here fails under the "not contemplated by the parties" exception.
Furthermore, RaCON's utility-delay claim is not actionable because of the exception in Ernst and MississippiTransportation for delays that extend such an unreasonable length of time so as to amount to or to justify an "abandonment" of the contract. Here the period of damages under the utility-delay claim extended less than 30 days (i.e., October 16 through November 13, 2000). That period could hardly support a claim that the County's alleged dilatory performance in relocating the Sonat gas pipeline amounted to or justified an "abandonment" of the County's contractual obligations.
Additionally, RaCON argues that it should be entitled to present the utility-delay claim to a jury based on the "active interference" exception in Ernst. While RaCON alleges that it repeatedly requested the County to relocate the Sonat gas pipeline, RaCON presents no facts to support a claim that the County "actively" interfered with RaCON's work. Likewise, the record does not contain any evidence of fraud or "bad faith" by the County in relocating the Sonat gas pipeline so as to invoke that exception in Ernst and MississippiTransportation.
Article III.A. excludes claims by RaCON for damages or additional compensation for delays on the project. Having found that none of the possible exceptions to enforcement of that provision that are argued by RaCON apply with respect to the utility-delay claim, we conclude that Article III.A. should be enforced in accordance with its terms. Accordingly, we affirm the summary judgment of the trial court for the County with respect to the utility-delay claim.
 IV. Conclusion
We affirm the trial court's summary judgments for the County on the rock-buttress claim asserted in count II, the misrepresentation claim asserted in count V, and the utility-delay claim asserted in count I. We also affirm the summary judgments for TTL on the misrepresentation and negligence claims and for BKI on the misrepresentation claim. The trial court shall proceed with further adjudication of RaCON's remaining claims.
AFFIRMED.
SEE, WOODALL, STUART, and BOLIN, JJ., concur.
[2] The contract documents also included certain addenda to the contract.
[3] In addition to the 100,000 tons of class 2 riprap estimated by TTL for use in rock buttresses, an additional 3,036 tons of riprap was specified for other applications on the project.
[4] Note 304 referred the bidder to sheets 3 through 3D of the plans. A draft of sheet 3D included a table on which the locations of rock buttresses and the volumes of material for the rock buttresses was prepared for possible inclusion in the bid package. That draft of sheet 3D was not given to the bidders.
[5] Other methods described in ALDOT specification 219 include excavation of loose materials, construction of drainage systems for removing surface or subsurface water, building slope retaining structures, or slope restoration with backfill.
[6] RaCON bid a total amount of $7.3 million for the project. If the plans for the project had stated that rock buttresses would not be constructed, which was RaCON's planning assumption, RaCON would not have been entitled to receive any more compensation from the County than the $7.3 million it bid for the project.
[7] In their respective proposals, the other six bidders included unit and total prices for item 41, the filter blanket material used for construction of rock buttresses. RaCON bid zero on item 41.
[8] The second lowest bid was for $8.2 million. The contractor making that bid included $1.41 million as the total price for item 40 (the class 2 riprap material contemplated for use in rock buttresses) and $2,027 for item 41 (the filter blanket material) in its proposal.
[9] TTL estimated in November 1999 that 100-000 tons of riprap would be needed for rock buttresses.
[10] The County also had the responsibility to acquire rights-of-way over other properties along the proposed roadway. Beginning in the summer of 2000, RaCON sent multiple letters to the County asserting that the County's delays in securing access to those properties had idled RaCON's equipment and prevented work by RaCON in certain parts of the project. Excluding the $106,443 claim attributable to the Sonat gas pipeline, in December 2000 RaCON billed the County approximately $1.45 million for idle-equipment costs allegedly attributable to the County's delays in securing access.
[11] The trial court certified 11 questions for permissive appeal pursuant to Rule 5, Ala. R.App. P., when it entered the summary judgments on various claims on May 21, 2004. This Court denied the request for a permissive appeal on June 25, 2004. The issues now before the Court are limited solely to those claims on which the trial court entered a summary judgment.
[12] An appellate court may affirm a trial court's judgment based on any valid ground presented in the record, whether that ground was considered, or even if it was rejected, by the trial court. General Motors Corp. v. Stokes Chevrolet, Inc.,885 So.2d 119, 124 (Ala. 2003).
[13] The bidders were to include in their proposals both a unit price and a total price for the estimated quantities. When the bidder included those prices, the County considered the unit price for that item and paid for the actual quantities used on the project. If the total quantity of materials used was less than the estimated quantity, the contractor received less total compensation for that item than the total price reflected on its bid response. Conversely, if the quantity of material used exceeded the estimated amount, the contractor would receive more total compensation for that item than the total price it stated for that item in its proposal.
[14] Bid instruction 10.B. advised RaCON that "quantities shown in the [bid] proposal [form] shall be considered by the contractor as the quantities required to complete the work for the purpose of bidding." In bidding zero for the rock-buttress materials, RaCON disregarded that instruction, but other bidders complied with it. The purpose of Alabama's competitive bid laws in Ala. Code 1975, § 41-16-20 et seq., is to promote fair and open competition in letting public contracts. See Arlington v. Associated General Contractors,403 So.2d 893, 899 (Ala. 1981). To hold that RaCON's rock-buttress claim against the County is actionable under these facts would be unfair to other bidders on the project and would undermine the purpose of these laws — to promote openness and fairness.
[15] On appeal RaCON and TTL also considered the significance of language in the trial court's order that "RaCON assumed the risk." If the trial court held that RaCON assumed the risk of the damages it incurred, RaCON argues that the summary judgment for TTL is not sustainable because (a) TTL did not plead assumption of the risk as an affirmative defense, and (b) there are insufficient facts in the record from which this Court might conclude that RaCON knowingly assumed the risk of building rock buttresses to prevent slope failures.
[16] The key facts underlying the Court's holding inBerkel that the owner had a duty of care to the subcontractor were as follows: the pilings installed by the subcontractor failed to pass load tests when the subcontractor used the grouting material originally specified for its work; the materials specified in the original grout mixture were insufficient to secure the pilings: a soils report provided to the subcontractor did not disclose a subsurface layer of cohesionless sand; and following the failure of pilings that were installed according to the original specifications, the subcontractor was directed to use a different method to install new pilings. 454 So.2d at 499-500.
[17] Factor number five (the moral blame attached to the conduct) is inapplicable because, absent personal injury, that factor is not relevant. 454 So.2d at 503. Also, given the rather unique set of facts and RaCON's novel theory in this case, the sixth factor in Berkel (the policy of preventing future harm) is not pertinent to our analysis.
[18] This adjustment mechanism is described in more detail in footnote 13.
[19] In a construction setting, a contractor usually agrees to perform the work specified in the plans or it does not assume the project. Whether a specification should be included, removed, or modified is a matter for the owner of a construction project, not a contractor, to decide.
[20] Had RaCON not "zero bid" items 40 and 41 and accepted the commercial risk of constructing rock buttresses, RaCON would not have suffered the alleged injury or loss from TTL's decision to require rock buttresses.
[21] The trial court decided that genuine issues of fact and law precluded a summary judgment on RaCON's negligence claims against BKI. Because BKI's role on the project differed from TTL's, our holding as to TTL does not decide RaCON's negligence claims against BKI.
[22] In Potter, the Potters received a survey at closing that arguably indicated the property they were purchasing was in a flood plain. Thereafter, the real-estate agent reassured the Potters that the property was not in a flood plain. 844 So. 2d at 551. The Potter Court held that, in view of the renewed assurances by the real-estate agent, a fact question existed as to whether the Potters had been lulled into a "false sense of security" so that delivery of the survey did not start the running of the fraud statute of limitations.844 So.2d at 552.
[23] The trial court ruled there are issues of fact and law on RaCON's claim alleging delays by the County in securing access over those properties.
[24] We have not been directed to any facts in the voluminous record that describe the terms of that oral amendment with any particularity.